**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**EL PASO DIVISION**

|  |  |
|---|---|
| TEXAS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS and the AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRANDON CREIGHTON in his official capacity as Chancellor of the Texas Tech University System, and ARCILIA ACOSTA, CODY CAMPBELL, CLAY CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DON SINCLAIR, DUSTIN WOMBLE, and RACHEL MCLELLAND, in their official capacities as members of the Texas Tech University System Board of Regents, <br><br> *Defendants*. | Case No.  26-1845 |

**<u>COMPLAINT</u>**

1.      By this action, Plaintiffs Texas American Association of University Professors-American Federation of Teachers ("Texas AAUP-AFT") and American Association of University Professors ("AAUP") and (collectively, "Plaintiffs'") on behalf of their members at Texas Tech University, Texas Tech University Health Sciences Center, Angelo State University, Midwestern State University, and Texas Tech University Health Sciences Center at El Paso challenge new censorship policies and processes in the Texas Tech University System, which violate the First

Amendment right of Plaintiffs' members to speak free of viewpoint discrimination, and the Fourteenth Amendment rights of Plaintiffs' members to be free from impermissibly vague policies and intentional racial discrimination.

2.      Specifically, Plaintiffs' members challenge two memoranda issued by Brandon Creighton, the current Texas Tech University System Chancellor and members of the Board of Regents for the Texas Tech University System (collectively, "Defendants"). These two documents lay out the policies and procedures that aim to censor Plaintiffs' members. The first document, "Memorandum to Presidents, Texas Tech University System: Course Content Oversight and Review," was issued on December 1, 2025, by Chancellor Creighton ("Creighton Memorandum I"). The second document, "Memorandum to University Presidents, Texas Tech University System: Texas Tech University System Course Content Guidelines" was issued on April 9, 2026, by Chancellor Creighton and the Board of Regents ("Creighton Memorandum II") (together, the "Creighton Memoranda"). The Creighton Memoranda violate the First and Fourteenth Amendments to the United States Constitution, as Plaintiffs' members allege as follows:

**PRELIMINARY STATEMENT**

3.      This case presents an extraordinary system of censorship in higher education, in which professors in the Texas Tech University System are prohibited from teaching the most basic scholarship, while at the same time not fully comprehending the contours of prohibitions that place them under threat of losing their employment and livelihood. Under this censorship regime, professors cannot teach Plato's *Republic*, the Pulitzer-Prize winning book *Between the World and Me*, the fact that gay and bisexual men were persecuted in Nazi Germany, or the existence of health disparities in rural communities in Lubbock and border communities in El Paso. Indeed, one professor was barred from even using the word "systemic." At Texas Tech University School of

Law, faculty were restricted from presenting factual information about race related to *Dred Scott v. Sanford* in a first-year constitutional law course. At the Texas Tech University Health Sciences Centers in Lubbock, faculty were instructed to remove material about effectively serving transgender patients and received guidance to refrain from *treating* transgender patients, for any medical condition, if a medical student was present. And Plaintiffs' members at Texas Tech Health Sciences Center El Paso received instruction to censor terminology in curriculum designed to train future medical professionals about underserved racial minorities and received mandates to censor coursework about LGBTQIA populations.

4.      To make matters worse, professors cannot reasonably make sense of what is and is not prohibited, further chilling their classroom speech. For example, some materials fall within an exception for graduate-level courses, but others inexplicably do not. And some materials are permitted because references to prohibited content are considered incidental to the main subject matter, while The *Republic's* mention of homosexuality is not. In a university system comprised of 65,912 students across five institutions, Defendants have created an educational environment replete with fear and confusion, rather than the academic excellence and free exchange of ideas that all universities endeavor to achieve.

5.      Moreover, the prohibitions themselves reveal the racial motivations behind this academic censorship. Aside from LGBTQ+ content, Defendants are clear in their intent to ban materials by Black authors and about Black people, including their experiences with racial inequality and the need to remedy those racial inequalities. There is no concern, for example, with professors teaching about discrimination against German or Irish immigrants in the United States or the persecution of white Catholics. Yet, professors are explicitly barred from teaching about disparities in health outcomes or a book by Ta-Nehisi Coates. There has been no enforcement to

date about coursework materials focused on white communities.

6.      The Creighton Memoranda lay bare Chancellor Creighton and the Board of Regents' efforts to obscure documented history, facts, and theories related to certain perspectives on race, sexual orientation, and gender identity within the Texas Tech system. They muzzle Plaintiffs' members from teaching all students in the Texas Tech system—from undergraduate students to medical students—the very information that Plaintiffs' members were hired to teach, and that Plaintiffs' members were trained to study, research, and provide instruction on. The Creighton Memoranda suppress constitutionally protected speech across the Texas Tech system. Plaintiffs' members have First Amendment rights in the public university setting. The Creighton Memoranda run roughshod over them: entire viewpoints relating to race, sexual orientation, and gender identity are forbidden from being taught in the classroom or included in student coursework. As a result, the Creighton Memoranda have impacted Plaintiffs' members across the Texas Tech system, preventing them from teaching students in Lubbock, San Angelo, Wichita Falls, and El Paso. The Creighton Memoranda violate not only the U.S. Constitution, but also the fundamental idea of what it means to be a public university in America: an institution of higher learning that promotes free expression and the rigorous exchange of ideas in service of the people and more importantly, the nation.

7.      Pursuant to the Creighton Memoranda, and under the threat of discipline, including termination, Chancellor Creighton mandated the review of every course taught in the Texas Tech system. The review required a stringent audit of viewpoints on race, sexual orientation, and gender identity that Chancellor Creighton found personally unsavory or disfavored. To effectuate this audit, faculty at every campus in the Texas Tech system were required to submit their course materials to an online portal and report if any of their courses contained viewpoints prohibited in

the Creighton Memoranda. These viewpoints include, for example, the "advocacy or promotion of race or sex-based prejudice," any reference to more than two sexes, any course materials related to gender identity, and any course materials related to "[Human] sexual orientation." If Texas Tech faculty responded affirmatively to any of these questions, Chancellor Creighton and the Board of Regents required them to immediately omit those topics and materials from courses until they were reviewed by the Board and approved or denied.

8.      Indeed, the course reviews pursuant to the Creighton Memoranda were announced at the tail end of the Fall 2025 semester and immediately implemented in the middle of the 2025-2026 academic year. And if faculty submitted potentially covered course material, they received notice to "delay" speaking about said course material until the Board of Regents rendered a decision. This meant courses that were already underway experienced immediate changes while results from the Board were pending. Even when the Board of Regents approved their curriculum, Plaintiffs' members often did not receive approval to teach material until the final days of the semester, effectively excising those curricular materials from their instruction from the Spring 2026 semester given the amount of material omitted and limited time after approval to teach those topics.

9.      Plaintiffs' members, who teach in the Texas Tech system, have experienced direct and continued harm due to the Creighton Memoranda. Besides the mandated censorship of materials, the restrictions in the Creighton Memoranda also caused Plaintiffs' members to immediately and constructively self-censor constitutionally protected speech about race, gender identity, and sexual orientation.

10.      In addition to the unprecedented encroachment upon the First Amendment rights of Texas Tech professors, the Creighton Memoranda violate Plaintiffs' members' Fourteenth

Amendment rights to due process because they employ language that is so vague as to prevent educators from sufficiently understanding the scope of their prohibitions. For example, the Creighton Memoranda exempt from censorship graduate school coursework and curriculum related to professional licensure or patient care. Yet, confusingly, Plaintiffs' members' curriculum for master's degrees, medical school licensing exams, and clinical programs for patient care were still modified to comply with the Creighton Memoranda, disregarding the explicit exceptions. This inconsistency creates bewilderment amongst Plaintiffs' members across the Texas Tech system and has led to, in some instances, over-compliance with the Creighton Memoranda due to Plaintiffs' members' fear of running afoul of their vague and contradictory guidelines. In effect, this broadens the already substantial chilling effect that the Creighton Memoranda have had on the assignment of course materials and classroom discussions.

11.     The dangers of chilling free thought and expression are especially prevalent in the university setting, where a tradition of diversity of thought and intellectual experimentation is central to America's intellectual and philosophic roots.

12.     As the United States Supreme Court recognized in *Sweezy v. New Hampshire*, no one should underestimate the vital role those who guide and train our youth play in our democracy. Imposing a strait jacket on the intellectual thought leaders in our colleges and universities imperils the future of our Nation.

13.     This is especially true in the social sciences—among the disciplines most directly impacted by the Creighton Memoranda—where few, if any, principles are accepted as absolutes. The scientific method, as applied in the social sciences, means ideas are constantly evolving, built upon, and refined. It is imperative that instructors always remain free to inquire, to study, and to evaluate, to advance critical thinking, and to achieve new levels of understanding; lest our

civilization stagnate and die.

14.     Racial discrimination motivated, at least in part, the Creighton Memoranda. This becomes clear when considering that the Creigton Memoranda have a legislative history: Chancellor Creighton first tried, and failed, to advance these very same viewpoint restrictions legislatively when he was a Texas state senator. The circumstances surrounding that legislative history, sequence of events, procedural departures, and contemporaneous statements surrounding the Creighton Memoranda establish a clear intent to discriminate against Black people. What's more: the implementation of the Creighton Memoranda caused—and continue to cause—disproportionate harm to Black people, including Black Plaintiffs' members.

15.     Chancellor Creighton issued the Creighton Memoranda with the intent to censor dissenting viewpoints and stifle speech on a range of topics concerning racism and inequality. Throughout his legislative tenure, Chancellor Creighton repeatedly targeted "ideologies" related to racial justice and equality. As recently as 2025, Chancellor Creighton sought to suppress these ideas legislatively, as evidenced by early iterations of higher education related bills he sponsored as a Texas state senator. Those early versions failed in the legislature. Now, Chancellor Creighton, freshly minted as head of the Texas Tech system, sought to suppress those same ideas through fiat. In fact, the Creighton Memoranda mirror the prohibitions in the early, failed versions of his bills. And unlike Senator Creighton then, Chancellor Creighton has succeeded.

16.     Rather than allow these important issues to be debated and explored in public academic discourse, Chancellor Creighton imposed his own viewpoints in public higher education, restricting the ability of Plaintiffs' members students to engage in any meaningful discussion about past and present impacts of racial discrimination on Black people in Texas or elsewhere in the United States, as well as efforts to remediate those impacts. In fact, the Creighton Memoranda are

so ill-advised and dogmatic in their approach that Plaintiffs' members are prevented from teaching unimpeachable and undisputed facts about history. Because of this, the Creighton Memoranda prevent Plaintiffs' members from teaching any remotely accurate or inclusive curriculum about this same subject matter, Black history—and by that, American history.

17.     In short: because the Creighton Memoranda attempt to erase certain coursework and classroom discussions on race, sexual orientation, and gender identity, they violate the First and Fourteenth Amendments to the U.S. Constitution. They violate the First Amendment right of Plaintiffs' members to disseminate facts and ideas without the government's imposition of its preferred viewpoints. They violate the Due Process Clause of the Fourteenth Amendment with language so vague and ambiguous that Plaintiffs' members are unable to discern what is, and is not, permissible under the terms of the Creighton Memoranda. Furthermore, they violate the Equal Protection Clause of the Fourteenth Amendment because they intentionally discriminate against Black professors.

18.     Plaintiffs' members have already had to attest to compliance with the Creighton Memoranda's prohibitions for the Summer 2026 and Fall 2026 terms. Plaintiffs' members will continue to suffer serious injuries unless this Court intervenes, declares the Creighton Memoranda unconstitutional, and enjoins their enforcement.

## **JURISDICTION AND VENUE**

19.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because this action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

20.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because a substantial

part of the events or omissions giving rise to the claim occurred in this district.

21.     The Court is authorized to award the requested declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act) and Fed. R. Civ. P. 57 and 65.

**PARTIES**

## I.     PLAINTIFFS

22.     Plaintiff American Association of University Professors ("AAUP") is a nonprofit membership association and labor union of faculty and academic professionals throughout the country. The AAUP is headquartered in Washington, D.C. Founded in 1915, the AAUP remains the nation's leading organization primarily dedicated to protecting academic freedom and shared governance in higher education. On August 1, 2022, AAUP affiliated with the American Federation of Teachers ("AFT").

23.     The AAUP's mission is to advance academic freedom and shared governance of higher education institutions; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, postdoctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make its goals a reality; and to ensure higher education's contribution to the common good.

24.     AAUP has approximately 50,000 members on college and university campuses across the country and helps shape American higher education by developing the standards and procedures that maintain quality in education and academic freedom in this country's colleges and universities. AAUP has members, including Black members, across the Texas Tech system.

25.     Plaintiff Texas American Association of University Professors – American Federation of Teachers ("Texas AAUP-AFT") was established in 1964 and is a member of national

AAUP and affiliated with AFT and Texas AFT and shares the mission of the AAUP, including to " advance academic freedom and shared governance; to define fundamental professional values and standards for higher education; to promote the economic security of faculty, academic professionals, graduate students, post-doctoral fellows, and all those engaged in teaching and research in higher education; to help the higher education community organize to make our goals a reality; and to ensure higher education's contribution to the common good."[1]

26.     Texas AAUP-AFT also shares the mission of AFT: "a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public education, healthcare, and public services for our students, their families, and our communities… committed to advancing these principles through community engagement, organizing, collective bargaining, and political activism."[2] The AFT today represents 1.8 million members, including Black members, in more than 3,000 local affiliates nationwide. The AFT is a union of professionals that champions fairness; democracy; economic opportunity; and high-quality public education. AFT's Higher Education division represents over 270,000 higher-ed employees. About 148,000 of them are tenure-line faculty, adjuncts, graduate employees, and academic professionals. Texas AAUP-AFT has members, including Black members, in the Texas Tech system.

27.     Plaintiffs AAUP and Texas AAUP-AFT have associational standing to bring these claims on behalf of their members because (1) their members have standing to sue on their own, (2) the interests they seek to protect are germane to the organizations' purpose, and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit as parties.

---

[1] *About the AAUP*, Am. Ass'n of Univ. Professors, https://www.aaup.org/about (last visited June 26, 2026).
[2] *Mission*, Am. Fed'n of Tchrs., https://www.aft.org/about/mission (last visited June 26, 2026).

## II.    DEFENDANTS

28.    Defendant Brandon Creighton is sued in his official capacity as Chancellor of the Texas Tech University System. The Chancellor is responsible for the "management and operation of the TTU system administration and component institutions under the direction of the Board."[3]

29.    Defendants Arcilia Acosta, Cody Campbell, Clay Cash, Tim Culp, Shelley Sweatt, Doug McReaken, Don Sinclair, Dustin Womble, and Rachel McLelland are sued in their official capacity as members of the Texas Tech University System Board of Regents. Members of the Board of Regents are delegated with the "power and authority to govern, control, and direct the policies of the TTU System."[4] Each Board member's duties entail establishing: "policy direction for and…goals consistent with the role and mission of each institution under its management and control."[5] Members are appointed by the Texas Governor and all but one serve staggered six-year terms. The exception is the student member, who serves a one-year term. McLelland is the current student member. Campbell is the current chairman of the Board.

## FACTUAL ALLEGATIONS

### I.  Protests in the Texas Tech Community, Along with Demonstrations Across the Country and Globe, Against Anti-Black Racism.

30.    Chancellor Creighton served in the Texas Senate from 2014 to 2025. During the later part of his tenure and until his resignation from the state senate, Chancellor Creighton served as the Chair of the Senate Subcommittee on Higher Education and as Chair of the Senate Committee on K-16 Education.

---

[3] Tex. Tech Univ. Sys. Bd. Of Regents, Regents Rules, ch.1, *Bylaws*, § 01.01.2 (rev. Feb. 26, 2026), https://www.texastech.edu/board-of-regents/regents-rules/chapter-02-administration.pdf.
[4] Tex. Educ. Code Ann. §109.001(c).
[5] Tex. Tech Univ. Sys. Bd. Of Regents, Regents Rules § 02.01(rev. Feb. 26, 2026), https://www.texastech.edu/board-of-regents/regents-rules/chapter-02-administration.pdf.

31.     During his tenure, then-Senator Creighton spearheaded legislative efforts to stifle classroom discussions and coursework about Black communities and implemented a discriminatory legislative agenda in the aftermath of the murder of George Floyd.

32.     In May 2020, the world watched in horror as video footage showed George Floyd cry for help and ultimately die at the knee of Derek Chauvin. In the weeks following George Floyd's killing, between 15 and 26 million people participated in 4,700 demonstrations across the United States to protest against anti-Black racism and police violence.[6] Outrage spread worldwide, as tens of thousands of protesters marched against structural racism—anti-Black racism in particular—in cities across the globe.[7] In Texas, peaceful protesters gathered across cities in West Texas—like Lubbock, Marfa, Waco, Odessa, San Angelo, and El Paso—to call for a reckoning on racial justice. [8]

33.     Black students in the Texas Tech system joined the of racial justice demonstrations. On June 30, 2020, 160 students signed a call to action at Texas Tech and the J.T. Margaret

---

[6] John Eligon, *Black Lives Matter Has Grown More Powerful, and More Divided*, N.Y. Times (June 4, 2021), https://www.nytimes.com/2021/06/04/us/black-lives-matter.html.

[7] Larry Buchanan et al., *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

[8] Sunny Sone, *The Protest Against Police Brutality in Texas*, in Photos, Tex. Observer (June 1, 2020, 7:05 PM), https://www.texasobserver.org/texas-protests-police-brutality-george-floyd/; Joshua Caves and Victor Glenn, *Community of San Angelo comes together to protest the killing of George Floyd*, Concho Va. Homepage (June 1, 2020, 11:24AM), https://www.conchovalleyhomepage.com/news/georgefloyd/the-community-of-san-angelo-comes-together-to-protest-the-killing-of-george-floyd/amp/; Veronica Martinez and Eleanor Dearman, *El Paso George Floyd protest: Police say officers assaulted, others disagree with the use of force*, El Paso Times (Feb. 4, 2021, 10:37PM), https://www.elpasotimes.com/story/news/2020/05/31/el-paso-protest-police-headquarters-george-floyd-death/5303954002/; Melanie Camacho, *Lubbock protesters demand action in response to death of George Floyd,* KCBD Newschannel.com (May 30, 2020), https://www.kcbd.com/2020/05/30/lubbock-protesters-demand-action-response-death-george-floyd/?outputType=amp.

Talkington College of Visual and Performing Arts School of Theatre and Dance, alleging that the school lacked sufficient diversity in faculty, staff, and staff selection, which resulted in displays of tokenism, racist depictions of Black and/or, Indigenous individuals and other people of color on stage, and the perpetuation of systemic racism, among other problems.[9] In August 2020, the Black Student Association (BSA) organized a meeting with then-Chancellor Ted Mitchell, then-Student Regent Sean Lewis, Texas Tech University President, Lawerence Schovanec in response to the activism on campus related to the murder of George Floyd, including the May 2020 protests, and a racist video about Black people created and shared by non-Black Texas Tech students earlier in the academic term.[10] Subsequently, in a video address issued on August 19, 2020, Texas Tech University President, Lawerence Schovanec, and then Vice President of Diversity, Equity and Inclusion, Carol Sumner, committed to "providing training on diversity, equity and inclusion to students faculty, staff and administrators."[11] President Schovanec identified the key area in need of address, stating that "the policies and procedures" related to "student organizations and behavioral expectations outlined in the Code of Student Conduct" must be corrected in order for Texas Tech University to "do a better job of connecting students affected by acts of bias and racism with the appropriate university resources and support." [12]

34.    The university also committed to the "research and planning" of a Black Cultural

---

[9] Brad Burt, *TTU students, alumni release call to action on reports of racism in School of Theatre and Dance, university responds*, KCBD11, (Aug. 12, 2020, 9:21PM), https://www.kcbd.com/2020/08/12/ttu-students-alumni-release-call-action-reports-racism-school-theatre-dance-university-responds/.

[10] Texas Tech University, Office of the President, *Texas Tech BSA Follow-Up Video with President Lawerence Schovanec – A BLACK Cultural Center! | The Thermo Sage*. YouTube, Aug. 19, 2020), at 00:50, https://youtu.be/tlggVp8oLV8?si=1wFyIZ1njXLGCozQ.

[11] *Id.* at 1:07-1:26.

[12] *Id.* at 1:30-1:52.

Center at Texas Tech University.[13] President Schovanec stated: "We recognize the hurt and harm caused by racism in our community and will work to repair and strengthen our relationships."

35.     The university opened the first Black Cultural Center at Texas Tech on September 9, 2022, as a space for all students to celebrate Black culture and its impact on Texas Tech University.[14]  At the opening ceremony, Carol A. Sumner, who was then Chief Diversity Officer at Texas Tech, stated, "[T]o know that [the Black Cultural Center] was started with students' voice, our students should be credited."[15]

## II.  Chancellor Creighton's Opposition to Racial Equity Efforts.

36.     Then-Senator Creighton commented, in April 2024, "I think over the last 10 years, and certainly after George Floyd's death, they seem to have ramped up [with DEI]."[16]

37.     After more than 170 confederate symbols—which have long been associated with the enslavement of Black people in the United States—were removed from public spaces or renamed in the aftermath of the racial justice protests.[17] Senator Creighton spoke publicly about maintaining these confederate monuments and introduced legislation in the Texas Senate to frustrate efforts to remove them.[18]

---

[13] *Id.* at 2:29-2:43.

[14] *Id.* and *See* Mateo Rosiles, *Texas Tech response to new state DEI laws concerns some on campus,* Lubbock A-J (Dec. 10, 2023), https://www.lubbockonline.com/story/news/local/2023/12/10/students-staff-upset-as-ttu-works-towards-compliance-of-sb-17-diversity-equity-inclusion-offices/71744905007/.

[15] Texas Tech Black Cultural Center, *TTU Black Cultural Center Grand Opening* (YouTube, Nov. 21, 2022 ), at 00:00-00:15, https://youtu.be/CKuR1kz00uI?si=4uOs6H3CvDGKvdV7.

[16] Mark Davis Show: *April 4, 2024 8am Hour*, at 18:58–19:16 (Omny Studio, Apr. 4, 2024), https://omny.fm/shows/the-mark-davis-show/april-4-2024-8am-hour.

[17] Damien Cave *et al.*, *Huge Crowds Around the Globe March in Solidarity Against Police Brutality*, N.Y. Times (June 9, 2020), https://www.nytimes.com/2020/06/06/world/george-floyd-global-protests.html; *see also* Alan Taylor, *The Statues Brought Down Since the George Floyd Protests Began*, The Atlantic (July 2, 2020), https://www.theatlantic.com/photo/2020/07/photos-statues-removed-george-floyd-protests-began/613774/.

[18] Acacia Coronado, *Confederate Symbols Prove Difficult to Remove in Many States*, Or. Pub.

38.    In response, Texas students called for more accurate and inclusive curricula that included more teaching about the history and experiences of Black people.[19] Senator Creighton led a group of legislators in co-sponsoring Senate Bill 3, which banned so-called "Critical Race Theory"[20] in publicly funded primary and secondary schools in 2021 during the 87th Legislature, 2nd Special Session.[21]

39.    During the 87th regular legislative session, Senator Creighton filed Senate Bill 2202, which included the following provision:

> No teacher, administrator, or other employee in any state agency, school district, campus, open-enrollment charter school, or school administration shall require, or make part of a course the following concepts:  (1) one race or sex is inherently superior to another race or sex; (2) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (3) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race

Board (Apr. 3, 2021, 12:48PM), https://www.opb.org/article/2021/04/03/confederate-monuments-removal-states-symbols-take-down/; Jeramy Kitchen, *Autopsy Report: Monument Protection Efforts Lack Tangible Results,* Tex. Scorecard (June 8, 2021), https://texasscorecard.com/state/87th-autopsy-reports/autopsy-report-monument-protection-efforts-lack-tangible-results/.

[19] *See, The Cultural Competency Action Plan*, DIGNITY FOR ALL TEX. STUDENTS, https://www.dignityforalltexasstudents.org/what-is-ccap [https://perma.cc/FY6V-JCX2] (last visited July 7, 2026); Leah Asmelash, *A School District Tried to Address Racism, a Group of Parents Fought Back*, CNN (May 5, 2021), https://www.cnn.com/2021/05/05/us/critical-race-theory-southlake-carroll-isd-trnd.

[20] CRT or Critical Race Theory "critiques how the social construction of race and institutionalized racism perpetuate a racial caste system that relegates people of color to the bottom tiers. CRT also recognizes that race intersects with other identities, including sexuality, gender identity, and others. CRT recognizes that racism is not a bygone relic of the past. Instead, it acknowledges that the legacy of slavery, segregation, and the imposition of second-class citizenship on Black Americans and other people of color continue to permeate the social fabric of this nation." Janel George, *A Lesson on Critical Race Theory*, AM. BAR ASS'N (Jan. 11, 2021), https://www.americanbar.org/groups/crsj/publications/human_rights_magazine_home/civil-rights-reimagining-policing/a-lesson-on-critical-race-theory/.

[21] Isabella Zou and Heidi Perez-Moreno, *Texas Senate advanced bills limiting education about race, access to abortion-inducing medications. The House is still sidelined. Tex. Tribune* (July 16, 2021, 6:33PM), https://www.texastribune.org/2021/07/16/texas-legislature-critical-race-theory-abortion/.

or sex; (4) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (5) an individual's moral character is necessarily determined by his or her race or sex; (6) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (7) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (8) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a members of a particular race to oppress members of another race.[22]

Senator Creighton then issued a tweet, stating that Senate Bill 2202 would prevent the federal government from "advancing mandates on requiring critical race theory curriculum because, in Texas, we will not make students apologize for our country and our history."[23]

40.     On February 13, 2023, Texas Lieutenant Governor Dan Patrick announced his top thirty priorities for the 2023 legislative session, including: "Senate Bill 16 – Banning Critical Race Theory (CRT) in Higher Education," "Senate Bill 17 – Banning Discriminatory 'Diversity, Equity, and Inclusion' (DEI) Policies in Higher Education" and "Senate Bill 18 – Eliminating Tenure at General Academic Institutions."[24]

41.     Senate Bill 16 ("S.B. 16"), which the legislature failed to pass, would have prohibited a "faculty member of an institution of higher education" from "compel[ing] or attempt[ing] to compel a student enrolled at the institution to adopt a belief that any race, sex, or ethnicity or social, political, or religious belief is inherently superior to any other race, sex, ethnicity, or belief."

---

[22] S.B. 2202, 87th Leg., Reg. Sess. (Tex. 2021) (introduced Apr. 1, 2021), https://capitol.texas.gov/tlodocs/87R/billtext/pdf/SB02202I.pdf.
[23] Brandon Creighton (@CreightonForTX), X (Apr. 20, 2021, at 6:56 PM), https://x.com/CreightonForTX/status/1384581772130676736.
[24] Lt. Gov. Dan Patrick Announces Top 30 Priorities for the 2023 Legislative Session (Feb. 13, 2023), https://www.ltgov.texas.gov/2023/02/13/lt-gov-dan-patrick-announces-top-30-priorities-for-the-2023-legislative-session/.

42.    The language of S.B. 16 mirrors the language of President Trump's Executive Order 13950, which banned the use of federal funding for programs that promoted any of nine so-called "divisive concepts."[25] These concepts include:

> (1) one race or sex is inherently superior to another race or sex; (2) the United States is fundamentally racist or sexist; (3) an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously; (4) an individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; (5) members of one race or sex cannot and should not attempt to treat others without respect to race or sex; (6) an individual's moral character is necessarily determined by his or her race or sex; (7) an individual, by virtue of his or her race or sex, bears responsibility for actions committed in the past by other members of the same race or sex; (8) any individual should feel discomfort, guilt, anguish, or any other form of psychological distress on account of his or her race or sex; or (9) meritocracy or traits such as a hard work ethic are racist or sexist, or were created by a particular race to oppress another race.[26]

43.    Executive Order 13950's preamble asserted that its prohibition of divisive concepts was intended to address a "destructive ideology . . . grounded in misrepresentations" of American history that suggest the country was founded "by white men, for the benefit of white men."[27] Executive Order 13950 asserted that the proposition of the United States being founded "by white men, for the benefit of white men" is a misrepresentation of American history without explaining why such a proposition is inaccurate.

44.    On December 29, 2020, a federal district court held that Executive Order 13950 violated the U.S. Constitution and enjoined its enforcement.[28] President Joe Biden rescinded

---

[25] Exec. Order No. 13950, Combating Race and Sex Stereotyping. 85 Fed. Reg. 60683 (Sept. 22, 2020), https://www.federalregister.gov/documents/2020/09/28/2020-21534/combating-race-and-sex-stereotyping.

[26] *Id.*

[27]  Exec. Order No. 13950 *supra* note 25.

[28] *Santa Cruz Lesbian and Gay Community Ctr. v. Trump*, 508 F. Supp. 3d 521, 550 (N.D. Cal. 2020).

Executive Order 13950 when he came into office in January 2021.[29]

45.     State lawmakers, including Senator Creighton with S.B. 16, replicated the provisions of EO 13950 to attempt to regulate curriculum and prevent certain discussions of race, sexual orientation, and gender identity in public universities. S.B. 16 never became law in Texas, but multiple legal challenges to similar "divisive concepts" legislation in Florida, New Hampshire, and Oklahoma resulted in courts finding such restrictions unconstitutional and granting injunctive relief against such laws.[30]

46.     In addition to spearheading legislation against "Critical Race Theory," Senator Creighton led legislative efforts against "Diversity, Equity, and Inclusion" in Senate Bill 17 ("S.B. 17"), which did become law. As introduced, S.B. 17 prohibited institutions of higher education in Texas from 1) endorsing "an ideology that promotes the differential treatment of an individual or group of individuals based on race, color, or ethnicity" or 2) providing the institution during the hiring process with a statement of the person's "views on, experience with, or past or planned contributions to efforts involving diversity, equity, and inclusion, marginalized groups, antiracism, social justice, intersectionality, or related concepts" and "views on or experience with race, color, ethnicity, national origin, or other immutable characteristics." The introduced version of S.B. 17 states that nothing in the proposed legislation "restrict academic research or coursework." The enacted version of S.B. 17 removed the language about "endorsing ideologies" and the

---

[29] Adam Harris, *The GOP's 'Critical Race Theory' Obsession*, The Atlantic (May 7, 2021), https://www.theatlantic.com/politics/archive/2021/05/gops-critical-race-theory-fixationexplained/618828/.

[30] *Pernell v. Fla. Bd. of Governors of State Univ. Sys.*, 641 F. Supp. 3d 1218, 1287-88 (N.D. Fla. 2022); *Loc. 8027 v. Edelblut*, No. 21-CV-1077-PB, 2024 WL 2722254, at *18 (D.N.H. May 28, 2024), *appeal filed* (24-1690) (1st Cir. July 26, 2024); *Black Emergency Response Team v. Drummond*, No. CIV-21-1022-G, 2024 WL 3015359, at *12-13 (W.D. Okla. June 14, 2024), *appeal filed* (24-6140) (10th Cir. July 16, 2024).

aforementioned topics related to racial justice and racial equity; however, it maintained the exemption for "academic course instruction" or "scholarly research or a creative work by an institution of higher education's students, faculty, or other research personnel or the dissemination of that research or work."

47.    Senator Creighton explained at a March 2023 Texas Senate Higher Education Subcommittee hearing on S.B. 17 that the bill intended to ban a concept he referred to as "DEI ideology," which "mirrors old Marxist talking points dividing the world into the oppressed and oppressors."[31]

48.    In social media posts after S.B. 17 passed at the Texas Senate, Senator Creighton wrote that S.B. 17 would "promote true diversity in higher education" and posted a video with a Black professor and two Black students with text banner overlays that stated, "Abolishing DEI."[32]

 

---

[31] Hearing Before the S. Subcomm. on Higher Educ., 88th Leg., Called Sess. at 2:17:00 (Tex. May 14, 2024) (statement of Sen. Brandon Creighton, Chair, S. Subcomm. on Educ.), https://senate.texas.gov/videoplayer.php?vid=20549&lang=en.
[32] Brandon Creighton (@CreightonForTX), X (Apr. 19, 2023, 10:08PM), https://x.com/CreightonForTX/status/1648871131686793216.

49.     After the passage of Senator Creighton's S.B. 17, the Black Cultural Center at Texas Tech University was defunded and repurposed to be the "Campus Engagement Center" in September 2023, a little over one year after its founding.[33]

50.     In a podcast interview about S.B. 17, on May 5, 2023, Senator Creighton complained about DEI trainings that directed individuals to "capitalize 'B' for Black in any reference and writing, but to lowercase 'w' for white in any use of the word as a reference to ethnicity."[34]

51.     Senator Creighton also led the efforts to abolish tenure in Texas through Senate Bill 18 ("S.B 18"), which also became law. S.B. 18 originally provided that "an institution of higher education may not grant an employee of the institution tenure or any type of permanent employment status."[35] In a podcast interview, on May 5, 2023, Senator Creighton talked about these three pieces of legislation, S.B. 16, S.B. 17, and S.B. 18, in concert and explained that "tenure and DEI tie together for me…And also I would add the ban on teaching CRT in higher education."[36] Senator Creighton also further reiterated on X, "When did colleges and universities forget that their mission is to educate and innovate, not indoctrinate…. [T]he Indoctrination is real. Stop the woke agenda- No CRT, No DEI, No Tenure."[37]

---

[33] Mateo Rosiles, *Texas Tech response to new state DEI laws concerns some on campus,* Lubbock A-J (Dec. 10, 2023),
https://www.lubbockonline.com/story/news/local/2023/12/10/students-staff-upset-as-ttu-works-towards-compliance-of-sb-17-diversity-equity-inclusion-offices/71744905007/.

[34] The Texan Podcast, Full Interview: Sen. Brandon Creighton on School Choice, Public University Tenure, Local Preemption (May 5, 2023),
https://www.buzzsprout.com/2037132/episodes/12793773-full-interview-sen-brandon-creighton-on-school-choice-public-university-tenure-local-preemption at 22:38.

[35] S.B. 18, 88th Leg., Reg. Sess. (Tex. 2023) (enrolled),
https://capitol.texas.gov/tlodocs/88R/billtext/pdf/SB00018I.pdf.

[36] The Texan Podcast, *supra* note 34at 19:50.

[37] Brandon Creighton (@CreightonForTX), X (Mar. 16, 2023, at 1:03 AM),
https://x.com/CreightonForTX/status/1636171205777432576 (reposted from Elon Musk,

52.    Senator Creighton's use of the term "woke" has racial undertones. The term "woke"—a term originated by Black Americans—dates back to at least the early twentieth century.[38] The early usage of the term typically signaled the concept of being "well-informed" or "up-to-date,"[39] as described by Harlem novelist Melvin Kelley in a 1962 New York Times op-ed about slang in urban Black American communities.[40] However, the term has evolved to describe someone who is "alert to racial or social discrimination and injustice."[41] The use of the term "woke" was popularized through its association with the Civil Rights Movement and, more recently, has been associated with calls for racial justice for Black Americans.[42]

53.    Building on the efforts to curtail racial justice perspectives related to so-called "wokeness" in S.B 17 and S.B. 18, Senator Creighton authored Senate Bill 37 ("S.B. 37") in the 2025 legislative session.

54.    Referring to S.B. 37, Senator Creighton stated, "[I]n this session we're [going to] strengthen it even more. So ESG [Environmental, Social, and Governance] and CRT in our K-12 in our public schools and the DEI woke garbage in our university level, Texas is taking a stand. . . ."[43]

55.    S.B. 37's initial version, a committee substitute, required the governing board of each institution of higher education in Texas to:

> [E]liminate curriculum that:  (A) teaches identity politics; (B) teaches that individuals of one race are inherently superior to

---

@elonmusk).

[38] *See,* Woke adjective earlier than 2008, Oxford English Dictionary; Woke up, Oxford English Dictionary (3d ed. 2017).

[39] *Id.*

[40] *Id.*

[41] *Id.*

[42] *Id.*

[43] Texas Youth Summit, *Multistreaming with Restream.io*, at 1:41:44 (YouTube, Sep. 20, 2024), https://www.youtube.com/watch?v=NZYYEIhaWgE.

individuals of another race or that individuals of one race bear personal or collective responsibilities for actions committed by other individuals of the same race; (C) is based on a theory that systemic racism, sexism, oppression, or privilege is inherent in the institutions of the United States or this state was created to maintain social, political, or economic inequities; or (D) requires or attempts to require students to adopt an ideology.[44]

56.    The enacted version of S.B. 37 removed this language Senator Creighton initially intended for the bill to contain. Instead, it provides that the governing board shall ensure courses in the curriculum: "(1) foundational and fundamental to a sound postsecondary education; (2) necessary to prepare students for a civic and professional life; (3) equip students for participation in the workforce and in the betterment of society; and (4) ensure a breadth of knowledge in compliance with applicable accreditation standards."[45]

57.    Through his initial version of S.B. 37, Senator Creighton endeavored to ensure that race was not discussed more than certain other topics. For example, during the floor debate for S.B. 37, Senator Creighton noted that "[w]hen we do a search at the University of Texas on keywords terms for course schedules that are offered, and the top three terms mentioned most frequently are gender—more than 400 times, race—200 times, identity—175 times, the Declaration of Independence—10 times, Abraham Lincoln—less than 10 times, Federalist Papers—less than 10 times."[46]

58.    When he was a senator promoting S.B. 37, Senator Creighton posted, "#SB37 ends

---

[44] S.B. 37, 89th Leg., Reg. Sess. (Tex. 2025) (as reported by S. Comm. on Educ. K-16, Apr. 8, 2025), https://capitol.texas.gov/tlodocs/89R/billtext/html/SB00037S.htm.
[45] *Id.*
[46]   Floor Debate on S.B. 37, 89th Leg., Reg. Sess. at 04:26:09 (Tex. 2025) (statement of Sen. Brandon Creighton), https://senate.texas.gov/videoplayer.php?vid=21768&lang=en.

DEI in Texas public university curriculum."[47] He also stated that "Texas continues to set a national standard for restoring common sense in higher education. As the author of SB 17, which banned DEI in hiring at our public universities, and SB 37, which reforms high ed governance by ending the woke ideological echo chamber for curriculum and the leftist grip of activist faculty senates—it's clear that Texas is leading the way."[48]

59.    Senator Creighton also shared that "Senate Bill 37 requires schools to eliminate woke indoctrination in core courses and gives Texans the power to report biased or inappropriate instruction"[49] and that "#SB37 ends DEI in Texas public university curriculum."[50]

60.    During an interview with the Texas Public Policy Foundation after becoming Chancellor of the Texas Tech system, Chancellor Creighton stated that "[w]here [Senate Bill 17] dealt with hiring, Senate Bill 37 is the next chapter dealing with curriculum. . . . Basically, there was quite a bit of garbage in curriculum all over university campuses all across America. . . . At Texas Tech, we're going to remain the tip of the spear on producing the highest degree of value."[51] Chancellor Creighton explained that Texas Tech is "closing out courses" that do not "lead to a degree of value or credential or a license or that it has indoctrination type content that is very easy

---

[47] Brandon Creighton, Facebook (August 21, 2025, at 8:16 PM), www.facebook.com/CreightonForTX/posts/pfbid0KmqYLedvn7fCUwHFUqsuz9ymVcMpvVR d7DZRqT9zcHHQEYsFB9ubA8NWqX3ZUohtl?rdid=SjjYOF3TJlHVXx0j#.

[48] Brandon Creighton, Facebook (July 25, 2025), https://www.facebook.com/CreightonForTX/posts/pfbid02dHi79svSt2C8MJZJ5SNm6L6vAyHP GnunsVK3Q5G4A27ygDru1tDY3SqPgh4fobVgl?rdid=CEBvzcJHtWakCE2I.

[49] E-mail from Brandon Creighton, Tex. Senator Brandon Creighton: Capitol Update 89th Legis. Session A Historic Legislative Session for Texas, (2025), https://mailchi.mp/d4f4f12efa34/89thsessionwrapup?e=[UNIQID].

[50] Brandon Creighton *supra* note 47

[51] Texas Public Policy Foundation, *Keynote Breakfast with Chancellors Brandon Creighton & Glenn Hegar | Texas Policy Summit 2026*, at 31:20–33:16 (YouTube, Apr. 9, 2026), https://www.youtube.com/watch?v=DhEH9pCZcJo.

to see."[52]

61.     Chancellor Creighton's targeting of curriculum that contains certain disfavored perspectives about race disproportionally impacts Black faculty because Black faculty at universities are more likely than their white colleagues to teach and research topics on race. "Nationally, a disproportionate number of instructors of color (that is, faculty members or graduate student instructors who identify or are identified as 'non-White') are engaged in teaching diversity courses in higher education."[53] Black sociologists, for example, more often than their white colleagues focus their research on "race/ethnicity."[54]

62.     Even within similar courses that do not focus on race, Black professors are more likely than their White colleagues to engage their students in activities examining diverse populations. For example, Black professors are more likely to assign "writing assignments that include diverse perspectives" and to allow "students [to] have serious conversations in [the] course with students of a different race or ethnicity."[55]

63.     Chancellor Creighton had discriminatory sentiments when sponsoring or supporting S.B. 3, S.B. 2202, S.B. 16, S.B. 17., S.B. 18, and S.B. 37—all legislative efforts to restrict education for Texans about systemic racial discrimination suffered by Black people in the United States and to suppress discussions of racial inequality—during his tenure as a State Senator, and these same sentiments motivated the issuance of the Creighton Memoranda.

---

[52] *Id.* at 45:13–45:34.

[53] Gary Perry et al., *Maintaining Credibility and Authority as an Instructor of Color in Diversity-Education Classrooms: A Qualitative Inquiry*, 80 J. Higher Educ. 80, 81 (2009).

[54] Jasmine L. Harris, *Black on Black: The Vilification of "Me-Search," Tenure, and the Economic Position of Black Sociologists*, 4 J. Econ., Race, & Pol'y 77, 82–83 (2021).

[55] Paul D. Umbach, *The Contribution of Faculty of Color to Undergraduate Education*, 47 Rsch. in Higher Educ. 317, 323 (2006).

## III. Senator Creighton's Appointment as Texas Tech Chancellor and Issuance of the Creighton Memoranda.

64.     The Texas Tech University System is comprised of five institutions: Texas Tech University (Lubbock, Texas), Texas Tech University Health Sciences Center (Lubbock, Texas), Angelo State University (San Angelo, Texas), Texas Tech University Health Sciences Center El Paso (El Paso, Texas), and Midwestern State University (Wichita Falls, Texas). The five institutions collectively serve 64,000 students, and is one of only nine university systems in the United States that offer programs that include undergraduate, medical, law, nursing, pharmacy, dental, and veterinary education.[56]

65.     The Texas Tech University System Board of Regents "unanimously appointed [Creighton] as the sixth chancellor and chief executive officer of the Texas Tech System" on September 30, 2025, with his appointment effective on November 19, 2025.[57] Following this appointment, Creighton formally resigned his seat in the Texas Senate in a letter to Texas Governor Greg Abbott, dated October 2, 2025.[58]

66.     Shortly after assuming his new role, Chancellor Creighton acknowledged his plans to restrict expression and academic freedom on campus. "To say that [the new course requirements are] a limit on free speech or academic freedom, I understand those concerns, and I certainly have great respect for our faculty, but we have to also chart a course for what the brand reflects,"

---

[56] *The Texas Tech University System*, Texas Tech, https://www.ttu.edu (last visited July 6, 2026).
[57] Kristina Butler, *Texas Tech University System Regents Appoint Senator Brandon Creighton as Chancellor and Chief Executive Officer*, Tex. Tech Univ. Sys. (Sep. 30, 2025), https://www.texastech.edu/stories/25-09-ttu-system-appoints-chancellor-and-chief-executive-officer.php.
[58] Alejandro Serrano, *Abbott sets special election in May for empty Texas Senate seat*, Tex. Trib. (Oct. 16, 2025, at 3:23 PM CT), https://www.texastribune.org/2025/10/16/texas-senate-district-4-special-election-2026/.

Creighton said in a December 2025 interview with the Chronicle of Higher Education.[59]

67.     Chancellor Creighton was asked about a hypothetical example: What about a "ethnic-studies professor teaching about white supremacy or activism within the Black Panther Party—is that not marketable in the way that you're describing it?" Creighton responded: "In the example that you gave, that would be reviewed by university leadership, by the department chair and the dean and the provost, to consider if it was indeed required for a professional license or certificate" as required by the Creighton Memoranda.[60]

68.     In that interview, Chancellor Creighton was further asked: "Do you think this policy might deter Black families… from sending their students to Texas Tech?" Chancellor Creighton did not deny any disproportionate impact of Black families but instead responded, "We work every day to extend a message and a signal that our door is open to every walk of life and every individual, no matter how different they may be. You can see that reflected on campuses across Texas. It's incredible to see the diversity that currently exists and the trends moving forward. But what we have not had in at least a decade is an environment that fosters diversity of viewpoint. There has been a tremendous focus on left of center to far left, but the rest of the diverse viewpoints have been left behind."[61]

69.     Chancellor Creighton was asked further whether "[r]estricting teaching on gender identity and sexuality and race helps achieve" diversity of viewpoint, to which Chancellor Creighton replied: "Yes. If you list the specific bullet points in our guidance memo, it's a

---

[59]  Jasper Smith, *The Man Behind Texas Tech's Controversial Curriculum Crackdown*, The Chronicle of Higher Education (Dec. 16, 2025), https://www.chronicle.com/article/the-man-behind-texas-techs-controversial-curriculum-crackdown?bc_nonce=vez844qxl9hsnuxlqxn28&cid.
[60] *Id.*
[61] *Id.*

continuum of common sense, and I believe it is consistent with what Texas and American families would be looking for in a university experience."[62]

70.     These sentiments motivated, at least in part, the issuance of the Creighton Memoranda.

### A.  Creighton Memorandum I

71.      On December 1st, 2025, Chancellor Creighton, issued Creighton Memorandum I, "Course Content Oversight and Review" to the Presidents of Texas Tech University, Texas Tech University Health Sciences Center, Angelo State University, Texas Tech University, Texas Tech University Health Sciences Center El Paso, and Midwestern State University.

72.     Creighton Memorandum I explains that "Texas Tech University System institutions must ensure that classroom instruction fully complies with state and federal law, Board of Regents policy, and Chancellor directives. Effective immediately, faculty must not include or advocate in any form course content that conflicts with the following standards."

73.     The first section of Creighton Memorandum I, "Advocacy/Promotion of Race or Sex-based Prejudice Prohibited," states that a faculty member, in their official capacity, may not promote or otherwise inculcate the belief that:

> (1) One race or sex is inherently superior to another; (2) An individual, by virtue of race or sex, is inherently racist, sexist, or oppressive, consciously or unconsciously; (3) Any person should be discriminated against or receive adverse treatment because of race or sex; (4) Moral character or worth is determined by race or sex; (5) Individuals bear responsibility or guilt for actions of others of the same race or sex; or (6) Meritocracy or a strong work ethic are racist, sexist, or constructs of oppression.

Creighton Memorandum I defines advocacy or promotion as "presenting these beliefs as correct

---

[62] *Id.*

or required and pressuring students to affirm them, rather than analyzing or critiquing them as one viewpoint among others. This also includes course content that promotes activism on issues related to race or sex, rather than academic instruction."

74.    The second section of Creighton Memorandum I, "Two Sexes Recognized Under the Law and in Course Content," provides that "State law and federal policy[63] dictate only two sexes, male and female, are recognized. Faculty are expected to comply with these standards when instructing students in their professional capacity, which includes submitting course content related to gender identity through the course content review process overseen by the Board of Regents."

75.    The third section of Creighton Memorandum I, "Review of Sexual Orientation Content Required," states that "Faculty are required to submit course content related to sexual orientation through the Course Content Review Process overseen by the Board of Regents." Sexual orientation is not defined.

76.    The final section of Creighton Memorandum I, "Course Content Review Process," states that "[i]f a faculty member believes a particular material or topic described above is implicated in their instruction or course materials, they must follow the Course Content Review

---

[63] Federal guidance regarding gender identity, Executive Order 14168, "Defending Women From Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" has been enjoined by multiple courts. *See, e.g.*, *City of Seattle v. Trump*, 808 F. Supp. 3d 1204, 1223 (W.D. Wash. 2025); *E.K. ex rel. Keeley v. Dep't of Def. Educ. Activity*, 807 F. Supp. 3d 517, 549 (E.D. Va. 2025), *appeal filed* (25-2497) (4th Cir. Dec. 22, 2025); *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1201 (N.D. Cal. 2025), *appeal filed* (25-4988) (9th Cir. Aug. 7, 2025); *Orr v. Trump*, 778 F. Supp. 3d 394, 432 (D. Mass. 2025), *vacated on other grounds, appeal dismissed*, No. 25-1579, 2026 WL 1642666 (1st Cir. June 5, 2026); *PFLAG, Inc. v. Trump*, 769 F. Supp. 3d 405, 455 (D. Md. 2025); *New York v. Trump*, 769 F. Supp. 3d 119, 146–47 (D.R.I. 2025), *aff'd in relevant part,* 170 F.4th 1 (1st Cir. 2026); *Washington v. Trump*, 768 F. Supp. 3d 1239, 1282 (W.D. Wash. 2025). *Doe v. Blanche*, No. 1:25-cv-286, 2026 WL 1642068, at *11 (D.D.C. June 7, 2026), *appeal filed* (26-5238) (D.C. Cir. June 24, 2026).

Process provided with this memorandum and the attached Course Content Review Process flowchart."



77.　　The Course Content Review Process flowchart first requires a faculty member to decide whether the material is "relevant *and* necessary" for classroom instruction. If the faculty member answers no, then the course content must be removed.

78.　　If the faculty member determines that the course material is relevant and necessary, then the faculty member must determine if the material is required for professional licensure/certification or patient/client care. If so, no immediate changes are made to the content, but it must be disclosed to the Department Chair, Dean, and Provost. The Provost then must provide a recommendation and justify the material's inclusion to the Chair and Vice Chair of the Academic, Clinical, and Student Affairs Committee. If the material is not required for licensure/certification or patient/client care, the faculty member must request a review for the

content to remain available in the course. The request starts with the Department chair and then moves to the Dean and eventually to the Provost. If the Provost believes the material does not need to remain, the course content is removed. If the Provost believes the material needs to remain, the Provost provides a recommendation and justification to the Chair and Vice Chair of the Academic, Clinical, and Student Affairs Committee (ACS Committee) who sit on the Board of Regents.

79. The bottom of the Course Content Review Process flowchart in Creighton Memorandum I states that the "Course Content Review Process is provided to support compliance with Board and Chancellor directives and applicable law, including S.B. 37. Guidance is specific to classroom instructional activities. Student-directed work, clinical and research areas are not affected at this time."

80. The Course Content Review process "is the first step of the Board of Regents' ongoing implementation of its statutory responsibility to review and oversee curriculum under Senate Bill 37 and related provisions of the Education Code. This curriculum review under Senate Bill 37 will, in part, ensure each university is offering degrees of value."

81. The final section of Creighton Memorandum I states, "Noncompliance may result in disciplinary action consistent with university policy and state law."

**B. Creighton Memorandum II**

82. On April 9, 2026, the Office of the Chancellor and the Board of Regents followed Creighton Memorandum I with the issuance of Creighton Memorandum II "Texas Tech System Course Content Guidelines." While Creighton Memorandum I instituted a procedure to determine permissible content for classroom instruction university-wide, Creighton Memorandum II established criteria to govern this review process at the discretion of the Board of Regents. The Creighton Memoranda were "developed by TTU System leadership in coordination with the ACS

Committee leadership following the review of submitted information" and sets forth a "system-wide standard" for all "course content and academic offering" across Texas Tech.

83.    Creighton Memorandum II also provides guidelines for the closure of academic programs that are "centered on" sexual orientation or gender identity (referred throughout the memorandum as "SOGI"), particularly where these concepts serve as the "primary subject, main theoretical framework, central narrative, or driving pedagogical purpose," within instructional materials. In such cases, the Texas Tech University System will cease to offer academic credentials in these fields, without barring current students from the ability to complete their degree programs. Creighton Memorandum II does not provide a pedagogical reason for the closure of these programs. There is no discernable difference between these academic programs and those which remain open apart from their viewpoints regarding sex orientation and gender identity.

84.    Creighton Memorandum II requires that classroom instruction is bound to the "legal recognition of only two human sexes and strictly prohibits the endorsement of a gender spectrum or fluid gender identities as empirical biological science." Faculty "may not teach that gender identity is a fluid spectrum, endorse the existence of more than two genders, or decouple gender from biological sex as a factual or scientific baseline." Creighton Memorandum II generally refers to "state and federal law" as a justification for this provision, without specific attribution to any particular authority.

85.    To operationalize this framework, Creighton Memorandum II outlines additional guidance including: (1) System-Wide Program Phase Out, (2) Core Prohibitions and Advanced Course Exceptions, (3) Temporary Teach-Out Exemptions, (4) Prohibition of Prejudiced Advocacy, and (5) General Exemptions.

86.    First, under "System-Wide Program Phase Out," Creighton Memorandum II

requires a "formal program review, followed by an admissions freeze, to initiate the closure of all academic credentials centered on SOGI." Creighton Memorandum II describes "readings, assignments, or lectures as 'centered on' SOGI when sexual orientation or gender identity serves as the primary subject, main theoretical framework, central narrative, or driving pedagogical purpose."

87.     Creighton Memorandum II also requires a "Comprehensive Program Review and Admission Freeze" and provides that:

> [T]o initiate the phase-out of SOGI centered academics, the Provost of each component institution must lead a review to identify specific degree programs, official tracks, majors, minors, and certificates that meet the 'centered on' threshold. Provosts must submit their finalized reports and program lists to the Office of the Chancellor no later than June 15, 2026. Following this review, institutions must implement a freeze on all admissions and declarations for these identified programs at both the undergraduate and graduate levels. During the subsequent teach-out period, component institutions must ensure that the temporary exemptions for SOGI instruction apply exclusively to graduate coursework. Undergraduate courses on a teach-out plan must comply fully with the Alternate Materials Rule and only utilize SOGI content as permitted by the non-core, upper-level undergraduate exceptions.

88.     Second, under "Core Prohibitions and Advanced Course Exceptions," Creighton Memorandum II requires a "strict prohibition on SOGI content in all core and lower-level undergraduate courses, requiring alternate materials if primary texts center on or include these topics. Conversely, upper-level undergraduate and graduate courses are restricted but feature clear exemptions for strictly defined academic purposes." The alternate materials rule requires:

> [C]ourses where course materials (inclusive of all assigned works, readings, case studies, peer-reviewed research, videos, etc.) are centered on or include sexual orientation or gender identity, alternate materials must be utilized. If instructors choose permissible works that do not center on or include these topics, instructor-led discussions, class assignments, and instructional materials must not focus on sexual orientation or gender identity.

- 32 -

> Incidental references should be avoided when selecting primary materials for core courses. If an adopted, industry-standard text includes SOGI content, instructors are not required to physically redact the text, but they must not highlight, assess, or allocate instructional time to it. There are no exceptions to the Alternate Materials Rule for core, undergraduate courses.

Creighton Memorandum II does not explain the pedagogical justification for treating undergraduate student coursework differently from graduate student coursework. Creighton Memorandum II describes incidental references as a "brief, passing, or factual mention (e.g., a short biographical note, a minor character trait, a single sentence in a larger text) that does not occupy sustained instructional time."

89.    In order to satisfy the requirement for a Texas Tech degree, students at Texas Tech are required to take 42 credit hours of general education courses—the core curriculum—to graduate. These credits are distributed across themes: nine credits of Communication; six credits of Mathematics; six credits of Life and Physical Sciences; two credits of Lab Sciences; three credits of Language, Philosophy, and Culture; three credits of Creative Arts; six credits of American History; six credits of Government/Political Science; and three credits of Social and Behavioral Sciences. The Creighton Memoranda's prohibitions are mostly heavily enforced against the core curriculum.

90.    Creighton Memorandum II provides that "exceptions to the Alternate Materials Rule are applicable for non-core, upper-level undergraduate and graduate coursework." However, these "exceptions do not permit an undergraduate course to center on sexual orientation or gender identity as a course topic." Creighton Memorandum II allows the following exceptions to the Alternative Materials Rule:

> ● **Data Sets and Methodological Analysis**: Instructors may utilize demographic data sets that include SOGI variables. During instructor-led discussions, faculty may explicitly define and discuss

these SOGI variables as they pertain to survey design, data collection, and statistical analysis. The instruction must remain focused on methodological mechanics and demographic realities, not sociological advocacy.

● **Biographical Context**: Discussion of biographical information of historically significant individuals may be included as contextual background. Such references must be purely incidental, and instruction and assignments must not make gender identity or sexual orientation the primary focus.

● **Upper-level, Undergraduate Public Policy**: Discussion of active public policy, proposed legislation, and legal frameworks that intrinsically include or are centered on gender identity or sexual orientation is permitted when analyzing primary source material. Analysis of primary works under this exception (such as textbook commentary) is permitted if the analysis is strictly objective legal or policy analysis and lacks advocacy for contemporary matters. The assigned primary sources (e.g., court briefs, legislation, judicial opinions) and permitted secondary analysis may reflect societal concepts of gender identity, but they must be analyzed objectively as subjects of public or legal dispute, rather than endorsed as biological fact.

● **Historically Intrinsic**: If a syllabus or course materials cover a specific historical movement, author, or event where SOGI is inextricably linked to the subject's historical significance (e.g., the Harlem Renaissance, the AIDS epidemic, Alan Turing), faculty may teach these subjects; however, the instruction must remain focused on objective literary/historical analysis, not contemporary SOGI advocacy.

● **Clinical Psychology and Health Services**: An exception is granted for upper-division undergraduate and graduate-level coursework within clinical, counseling, and school psychology programs. Instructors in these specified courses may include and evaluate SOGI topics exclusively through the lens of objective clinical assessment and current DSM diagnostic criteria. To maintain alignment with state and federal law and TTU System guidance, this instruction must not endorse fluid gender identity as an empirical biological reality that supersedes the two-sex requirement, nor may programs compel students to personally affirm gender ideology, provided the student demonstrates the ability to deliver standard, non-discriminatory clinical care.

91.    Third, under "Temporary Teach-Out Exemptions," the exemptions are "carefully delineated, strictly temporary instructional frameworks for certain graduate coursework. Certain

- 34 -

SOGI instruction is permitted only for currently enrolled students completing formally identified teach-out programs at the graduate level."

92.　However, several of the provisions framed as "exemptions" are not actually exemptions because they merely delay implementation of the complete prohibition on curriculum centered on SOGI. For example, Creighton Memoranda II labels exemption for "SOGI Theory and Frameworks" for graduate students as "Strictly Temporary." No *new* graduate students are allowed to learn the material; it is only allowed for current graduate students already in the process of completing their degree program. In the meantime, Defendants are closing the entire Women and Gender Studies *program itself*.

93.　Fourth, under "Prohibition of Prejudiced Advocacy**,**" Creighton Memorandum II requires a "ban on instruction that advocates for concepts of inherent racial or sexual superiority, inherent bias, or collective guilt" without defining these concepts. Creighton Memorandum II provides:

> [W]hile instructors may include scholarly theories that examine the prohibited advocacy concepts below, they may not pressure students to adopt or endorse them. Any instruction involving these frameworks must be framed rigorously and objectively as theoretical concepts rather than empirical facts. Furthermore, if theories that advocate these concepts are included in a course, they must be presented alongside alternative scholarly perspectives. To ensure academic objectivity, faculty are prohibited from teaching as absolute truth that:
>
> ● One race or sex is inherently superior to another;
> ● An individual, by virtue of race or sex, is inherently racist, sexist, or oppressive, consciously or unconsciously;
> ● Any person should be discriminated against or receive adverse treatment because of race or sex;
> ● Moral character or worth is determined by race or sex;
> ● Individuals bear responsibility or guilt for actions of others of the same race or sex; or
> ● Meritocracy or a strong work ethic are inherently racist, sexist, or constructs of oppression.

94.     Finally, Creighton Memorandum II provides general exemptions. Specifically, consistent with TTU System guidance, these guidelines apply strictly to classroom instructional activities and instructor-required or recommended course content. The following areas are exempt from restrictions regarding SOGI themes:

> ● **Student-Directed Work and Research**: General independent student research (e.g., standard term papers) and student-selected performance pieces remain exempt from these content restrictions. However, a strict temporal constraint applies to all formal academic credentialing. Graduate theses and dissertations may only center on SOGI topics as a strictly temporary teach-out exception, explicitly limited to currently enrolled students completing their degrees within formally identified teach-out programs. Upon the conclusive termination of all designated teach-out programs, no degree culminating student research within the TTU System will be permitted to center on SOGI topics.
> ● **Faculty Scholarship Exemption**: Although future faculty hiring guidance will prioritize recruitment in alignment with this memorandum, currently employed faculty members may continue to research and publish topics of their choosing.
> ● **Licensure, Certification, and Patient Care Exception**: If course material centering on or including SOGI themes is strictly required for professional licensure, professional certification, or patient/client care, and this requirement is formally disclosed to the ACS Committee of the Board of Regents, no immediate changes to the course content are required. The ACS Committee may require changes if, upon further review and consultation with the respective Provost, the committee determines the material is not strictly required by the relevant licensing or credentialing body, or if the content disclosed under patient and clinical care is determined not to be strictly required for such care.

## IV. Rollout of the Creighton Memoranda.

### A. Curriculum Review Process at Texas Tech.

#### i. *Spring 2026 Course Content Oversight and Review Portal*

95.     On December 19, 2025, the Provost's office announced the launch of an online portal, the Spring 2026 Course Content Oversight and Review portal, to enforce compliance with

Creighton Memorandum I. The office notified faculty that they had until the first day of class to submit course materials for the Provost's review. The Spring 2026 semester started less than one month later on January 14, 2026.

96.    The online portal stated, "This process is designed to provide instructors with procedures to inform the institution about course content that potentially conflicts with topics as outlined in the December 1, 2025 memo from the Texas Tech University System on Course Content Oversight and Review. Submitting this information ensures that instructors comply with the requirement to submit course content for review."

97.    The memo referenced in the online portal is Creighton Memorandum I, which states that "[i]f a faculty member believes a particular material or topic described above is implicated in their instruction or course materials, they must follow the Course Content Review Process provided with this memorandum and the attached Course Content Review Process flowchart."

98.    Faculty received the online portal on December 19, 2025, during the university system's winter break period. Professors, including Plaintiffs' members, were uncertain and confused about what courses are subject to review and how to complete the university's course content review process because Creighton Memorandum I provided insufficient guidance. Later, university administrators across the Texas Tech system explained that all courses offered at the system's member schools would be subject to review under the Creighton Memoranda.

99.    The online portal defined course content as "anything required and delivered by the instructor. Content may include, but is not limited to, readings, videos, assignments, discussions or specific lessons. This could be a single course element, a longer section of the class or the entire course." The online portal provided as an example, "One class session includes a documentary clip discussing how sexual orientation has been represented in media, followed by short, written

reflection connecting the content to the week's objectives." The portal further provides "the more directly alignment is demonstrated between course content and Course Learning Outcomes, and when applicable, Core Foundational Component Area Objectives, the better positioned the Office of the Provost will be to make informed recommendations and confirm compliance."

100.    The portal also mandated: "Primary Instructors of Record (IOR) will submit one form for each course section they are teaching. If multiple sections taught by the same instructor share the same syllabus and course content, only one form is required."

101.    As part of the online portal, professors were asked four questions to determine whether their courses complied with the Creighton Memorandum I: (1) Do course materials contain "Advocacy/Promotion of Race or Sex-Based prejudice" as defined in the Chancellor's memo, (2) Do course materials contain references to more than "Two [Human] Sexes Recognized Under Law", (3) Do course materials contain "content related to gender identity?" and (4) Do course materials contain content related to "[Human] Sexual Orientation?"

102.    If professors answered no to all four questions, no further action was required. If faculty attested that their courses implicated content identified in Creighton Memorandum I, they were required to provide additional disclosures if they wanted permission to teach the prohibited content.

103.    Faculty were limited to 4,000 characters to justify the prohibited content through descriptions of the learning outcomes of the content at issue. Additional space was provided to detail course content, its alignment to learning objectives, and its connection to core area objectives. As part of this self-attestation process, faculty were not required to upload course syllabi or the underlying course materials to confirm their compliance.

104.    All Texas Tech faculty had to submit a signed entry into the portal attesting that "I

understand that because my content disclosed here is not required for professional licensure/certification or patient/client care, I should 'omit or delay teaching [course content] until final approval' to maintain compliance."

105.    Pursuant to the Creighton Memoranda, Texas Tech mandated that Plaintiffs' members affirm compliance with the provisions in the Creighton Memoranda in order to teach in the Summer 2026 and Fall 2026 terms.

106.    Chancellor Creighton publicly stated that the Board of Regents built an artificial intelligence model to review the Texas Tech University System's course submissions.[64]

107.    Chancellor Creighton explained at the Policy Summit in April 2026, "[W]ell, again, as an extension of the requirements of Senate Bill 37, we're going through an exhaustive review of all courses within our university system. And with, you know a couple of thousand faculty and over you know 65,000 students and 14,000 courses, you can do that on the honor system where those courses are just submitted, and they're checked by green light or red light from the faculty, or you can do what Texas Tech has done. And we've built an AI algorithm, and we've submitted the syllabus and all course reading material materials and the lesson plans from the previous teachings of those courses."[65]

108.    Plaintiffs' members have observed administrators at Texas Tech deviating from the course content review process flowchart, as outlined by the Creighton Memorandum I, with no apparent consequences.

109.    After some of Plaintiffs' members disclosed the course material they deemed relevant and necessary but not required for licensure to their Department Chair, the Dean and the

---

[64] Texas Public Policy Foundation, *supra* note 51, at 43:35.
[65] *Id.* at 43:22–44:10.

Provost, the content review process stopped all together and their courses were not sent to the Board of Regents for further review, contrary to the flowchart process in Creighton Memorandum I. At other times, the Department Chair, Dean, and the Provost recommended no modifications to course materials, but the Board of Regents nevertheless mandated modification.

### ii. *Normal Curricular Review Process*

110.    The typical curriculum review process at Texas Tech involves faculty, department chairs, deans, and administrators. It is interdisciplinary, intensive, and aims to ensure students at Texas Tech are receiving the full suite of the educational experience they enrolled in. Typically, this process starts with the people who know the subject matter best: the faculty hired to teach it. Faculty teaching a course—those who rotate in and out of teaching sections—would identify at what is missing and needs to be added or what is unnecessary and needs to be removed from course content summarized in the syllabi. Those conversations would be based on goals for improvement in the context of the degree program, learning outcomes, and degree outcomes expected of students graduating from that department. Faculty start the curriculum review process whenever major changes to the course content occur.

111.    Next, the proposed curricular change is launched in a system that allows for successive levels of approval. The need for the change is considered at the departmental level, usually to the chair/director and to a faculty body charged with considering curricular changes in the department. The departmental committee would see if the change proposed aligns with the department's goals for strategic planning and for maintaining and developing the curriculum in an effective way. They then look to ensure there is a connection between the specific curricula and the faculty who will teach it.

112.    After the proposed curricular change passes the department committee and is

approved by the chair/director, it passes to a college-level curriculum committee. At that stage, representatives from each department in the college typically review the proposed change. Faculty from the department sponsoring the change typically abstain from voting.

113.    After passing the college-level committee, the proposed change normally goes to the Provost's office, where it is reviewed by the Academic Council. The Academic Council has representatives from all colleges. "Among a variety of issues, the Council considers requests for new academic programs and recommends course additions, changes, and deletions."[66] The council conducts higher level checks on what the proposed changes are, focusing specifically on how the change fits within the academic program and whether the change is duplicative or wanders too far from the course and/or degree program's disciplinary focus. The council can also check to be sure that the course is properly cross-listed with other departments where students should get credit—this requires the department's consent to cross-list.

114.    Only after the multi-layered, multi-divisional steps above can a curriculum change be approved through Texas Tech's normal process, which typically takes at least an academic year, and often longer.

115.    A change in the Core Curriculum involves additional requirements. The Core Curriculum Committee has a steering committee and subcommittees, and each subcommittee represents one of Texas Tech's core requirements: Communication; Language, Philosophy, and Culture; Life and Physical Sciences; Mathematics; Social and Behavioral Sciences; American History; Government/Political Science (currently empty); and Creative Arts. [67] These

---

[66] *Academic Council*, Tex. Tech Univ: Off. Provost,
https://www.depts.ttu.edu/provost/councilscmtes/academic_council.php (last visited June 29, 2026).
[67] *Core Curriculum Committee*, Tex. Tech. Univ.: Off. Provost,
https://www.depts.ttu.edu/provost/curriculum/core-curriculum/core-multicultural-curriculum-

subcommittees review and approve any change in core listings. They carefully evaluate the proposed curriculum from the perspective of the academic discipline but also to ensure the course meets the core learning outcomes. Approved curricular changes normally take effect in the Fall term to align with publication of the Undergraduate and Graduate Catalog.

116.    All academic departments are highly motivated to have courses in the Core Curriculum because such entry drives class enrollment and signals that the specific discipline taught in that class is sufficiently important so that all students at Texas Tech must learn the information. To have a course in the Core Curriculum reflects the value and importance of that course and its discipline.

117.    Under the Creighton Memoranda, *none* of these committees or processes are involved in the modifications of course curricula. Moreover, rather than taking a year or longer of thoughtful deliberation with faculty experts and cross-disciplinary consultation, the Creighton Memoranda ushered in a process that transpires in days—not weeks or years, with artificial intelligence replacing faculty review of curricula.

### B.  Curriculum Review Process at Angelo State University.

118.    On December 1, 2025, the faculty at Angelo State University, one of the institutions in the Texas Tech system, received notice of Creighton Memorandum I. On December 8, 2025, the Provost's office launched a "Course Content Review Qualtrics Form" ("Angelo State Review Portal Form") to comply with the Content Oversight and Review Memorandum and notified staff that responses were due by 11:59 p.m. on December 22, 2025–only two weeks later. The Spring 2026 semester started on January 21, 2026. The Provost required professors of record to complete the "Angelo State Review Portal Form" for each course they taught to be "in accordance with

committee.php (last visited June 29, 2026).

Senate Bill 37 and Texas Tech University policy."

119.    The Angelo State Review Portal Form did not require professors to specify which of their teaching materials were implicated. The survey contained no character limit for responses nor required the submission of syllabi or other course related content, as part of the disclosure process.

120.    The Angelo State Review Portal Form also mandated: "Professors of Record will submit one form for each course section they are teaching. A response is required for every course with a unique CRN number."

121.    The Angelo State Review Portal Form did not require an attestation that Professors would omit or delay subject matters, but university administrators instructed faculty not to teach implicated course content until approved.

122.    The Angelo State Review Portal Form asked professors of record three questions to determine whether their courses complied with Creighton Memorandum I. The first question asked: (1) Does this course include any content that advocates for or promotes race- or sex-based prejudice, as defined in the Chancellor's Memorandum? The Angelo State Review Portal Form defined advocacy and promotion as "presenting these beliefs as correct or required and pressuring students to affirm them, rather than analyzing or critiquing them as one viewpoint among others. This includes course content that promotes activism on issues related to race or sex, rather than academic instruction." The second question asked: "(2) Does this course contain any content that recognizes or discusses more than two sexes (male and female), or addresses gender identity beyond what is recognized under state and federal law?" It clarifies that "State and Federal policy dictates that only two sexes, male and female, are recognized." The final question asked: "(3) Does this course include any content related to sexual orientation?" Additionally, any course content

addressing sexual orientation must be submitted for review as required by the Chancellor's Memoranda.

123.    On January 8, 2026, the Provost emailed professors who were identified as operating out of compliance with Creighton Memorandum I and requested re-submission of the form into the Angelo State Review Portal. Administrators at Angelo State lost the original submissions. If professors failed to resubmit to the Angelo State Review Portal they faced potential punitive measures by university administration.

124.    Following the deadline to complete submissions to the Angelo State Review Portal, the Provost forwarded eleven courses to the Board of Regents for further review.

125.    Although the Board of Regents must review submitted curricula under Creighton Memorandum I, Angelo State denied many of Plaintiffs' members courses even though they had not yet been reviewed by the Board of Regents. Angelo State also requested that some Plaintiffs' members modify course materials even though there had been no submission through the portal and no review by the Board of Regents.

126.    Thus Plaintiffs' members at Angelo State University experienced implementation incongruent with the rubric outlined in the Creighton Memoranda process. For example, Plaintiffs' member (Member #1) at Angelo State believed that their course materials did not fall within the content review process' implicated topics and thus did not flag any materials necessary for review in completing the content review process online portal. Yet Member #1 was still required by a Department Chair and the Angelo State Provost's office to modify, delay and remove course content outside of the content review process' guidance.

127.    This entire process also ran contrary to the ordinary procedures for curriculum review at Angelo State.

128. The curriculum review process at Angelo State abides by a rigid timeline, with dates for meetings to discuss proposed curriculum changes scheduled before the academic year begins, all of which normally takes between five to eleven months.[68] Changing the curriculum involves multiple levels of reviews and committees and constitutes a combined effort of the college and university faculty.

129. The curriculum change process begins with the academic department's department chair.[69] The department chair notifies the college dean of the potential need for curriculum change.[70] The dean then notifies the college's College Curriculum Committee of the potential change to begin the formal curriculum review process.[71]

130. The College Curriculum Committee includes the college dean, academic department chairs, faculty members, and a librarian.[72] The "primary responsibility" of the College Curriculum Committee is "to make recommendations to the dean . . . including changes in established curricula."[73] The committee determines if the proposed change aligns with the school's need and further develops the proposal if warranted.

131. The proposed change may also go to the Core Curriculum Committee if it involves a course listed in one of Angelo State's core curriculum.[74] The Core Curriculum Committee includes a faculty from each academic area in the core curriculum.[75] The Core Curriculum

---

[68] Angelo State Univ., *2026–2027 Timelines: Personnel and Curriculum* (June 11, 2026), https://www.angelo.edu/live/files/27584-timelines-personnel-and-curriculum.
[69] *Id.*
[70] *Id.*
[71] *Id.*
[72] *OP 04.01 Councils and Committees*, PolicyStat: Angelo State Univ., https://angelo.policystat.com/policy/20378874 (last visited June 29, 2026).
[73] *Id.*
[74] *See* Angelo State Univ., *supra* note 68.
[75] *OP 04.01 Councils and Committees*, *supra* note 72.

Committee approves any changes to the core curriculum and "makes recommendations to the [Provost and Vice President for Academic Affairs] affecting the University's core curriculum."[76]

132.    If all necessary committees approve the proposed curricular change, the proposal next goes to the University Curriculum Committee.[77] The University Curriculum Committee includes the faculty senate president, faculty members from each college, and tenured faculty representatives.[78] The faculty senate president first shares the proposed change to the broader faculty senate for discussion by the Academic Affairs Committee during a faculty senate meeting.[79] If both the faculty senate and university committee approve the change, the committee review of the curriculum change is complete.[80] The University Curriculum Committee would then send any final recommendation to the Provost and Vice President for Academic Affairs on the university's curriculum.[81]

133.    The approval process following the University Committee's approval was altered in June 2026. In the prior 2024–2025, the University Committee would send the proposal to the Provost, then to the President, and the last body to review the change would then be the Board of Regents, at which point, the curriculum change would be final.[82] The new 2026–2027 timeline removes the Provost and President's curriculum review and sends the change directly to the Board of Regents.[83]

---

[76] *Id.*

[77] *See* Angelo State Univ. *supra* note 68.

[78] *OP 04.01 Councils and Committees*, *supra* note 72.

[79] *See* Angelo State Univ., *Angelo State University Faculty Senate Bylaws* 2, 5 (June 11, 2026), https://www.angelo.edu/live/files/28868-by-laws-of-the-faculty-senate.

[80] Angelo State Univ., *supra* note 68.

[81] Angelo State Univ., *2024–2025 Timelines: Personnel and Curriculum* (Jul. 15, 2024), https://web.archive.org/web/20240801020109/https:/www.angelo.edu/live/files/27584-timelines-personnel-and-curriculum (last visited Aug. 1, 2024).

[82] *OP 04.01 Councils and Committees*, *supra* note 72.

[83] Angelo State Univ., *supra* note 68.

**C. Curriculum Review Process at Texas Tech University Health Sciences Center at Lubbock.**

134. Upon the issuance of Creighton Memorandum I, university administrators mandated the removal of curricular content involving intersex and transgender people and restricted medical student training around transgender patients—without any outlined procedures—sidestepping the ordinary procedures for curriculum review at Texas Tech University Health Sciences Center Lubbock and the flawed procedures but forward in Creighton Memorandum I.

135. Curriculum review at Texas Tech University Health Sciences Center Lubbock is an integrated process, requiring interdepartmental coordination at the individual school level and the university level.[84] Any curriculum change is the result of a joint effort by faculty, administrators, provost offices, and school accreditation liaisons.[85]

136. A curriculum change is typically initiated by program, department, or school discussions.[86] The discussions will next go to the university level, where the school notifies the Provost Leadership Team, and the school accreditation liaisons notify the Vice Provost for Academic Affairs and Integrated Learning about pursuing the change.

137. Next, the school engages in its curriculum review process, which may differ at each school. [87] For example, at the School of Medicine, the Curriculum and Educational Policy Committee is responsible for curriculum review.[88] The Committee has representation from faculty

---

[84] Tex. Tech Univ. Health Scis. Ctr., *Operating Policy and Procedure: 60.11, Development, Revision, or Termination of Academic Programs and Units* 2 (Mar. 31, 2025), https://www.ttuhsc.edu/administration/documents/ops/op60/op6011.pdf.

[85] *Id.*

[86] *Id.*

[87] *Id.*

[88] Tex. Tech Univ. Health Scis. Ctr. Sch. Med., *SOM Policy and Procedure: 20.05, FACULTY COUNCIL BYLAWS* 5–6 (Dec. 28, 2023),

at each of the school's campuses and students.[89] In accordance with medical school accreditation standards, the Committee is the sole body that can review and make changes to the school's curriculum.[90] The school must also notify university departments that the curriculum change might affect, including information technology services and the libraries.[91]

138.    If the school approves the proposed curriculum change, the proposal is presented to the university's Academic Affairs and Curriculum Committee for further review.[92] Following the committee's approval, the change is forwarded to the Provost and Academic Council.[93] The Provost and Academics Council may be the last bodies to review the change, as notification to the President is only "as needed" and the Board of Regents' approval is required "if applicable."[94]

## D. Curriculum Review Process at Texas Tech University Health Sciences Center at El Paso.

139.    Texas Tech University Health Sciences Center El Paso consists of the Paul L. Foster School of Medicine, Gayle Greve Hunt School of Nursing, L. Frederick Francis Graduate School of Biomedical Sciences, and Woody L. Hunt School of Dental Medicine.

140.    Texas Tech University Health Sciences Center El Paso "is a Hispanic Serving Institution situated on the US-Mexico border that is committed to addressing current and emerging health concerns affecting the El Paso community, our region and beyond."[95] Medical school

---

https://www.ttuhsc.edu/medicine/documents/policies/SOMOP20.05.pdf.

[89] *Id.* at 6.

[90] *Id.* at 5; *LCME Standards and Elements: Element 8.3 Curricular Design, Review, Revision/Content Monitoring*, Tex. Tech Univ. Health Scis. Ctr.: Sch. Med.: Academic Affairs (Jul. 1, 2024), https://www.ttuhsc.edu/medicine/academic-affairs/lcme_standards.aspx#element8-3.

[91] Tex. Tech Univ. Health Scis. Ctr, *supra* note 84.

[92] *Id.*

[93] *Id.*

[94] *Id.*

[95] *About Our School*, Texas Tech Health El Paso, https://ttuhscep.edu/som/about.aspx (last visited June 18, 2026).

students are "integrated into the community. At the only four-year medical school on the U.S./Mexico border, students interact with their diverse community through the Society, Community, and Individual course."[96]

141.    The El Paso health center provides critical preventative and lifesaving care to El Paso and surrounding communities. As the school notes, "In 2008, prior to the opening of the Foster School of Medicine, El Paso County's average number of physicians per 100,000 people was 75% less than the national average. Ten years later, that shortage has been reduced to 60% after the medical school's opening."

142.    Research shows that cross-cultural medical training helps medical students become better prepared to serve diverse patients and communities as doctors.[97] "Medical schools should continue to support multicultural pursuits to prepare students to become physicians sensitive to the needs of diverse patients."[98]

143.    In the fall of 2025, 505 students enrolled at the Paul L. Foster School of Medicine; 239 students enrolled in the dental school, 265 students at the nursing school, 52 students enrolled in the school of biomedical sciences, 265 students enrolled in the dental school.[99]

144.    Upon the issuance of Creighton Memorandum I, administrators restricted faculty from teaching medical curriculum about underserved populations without any outlined procedures,

---

[96] *Id.*

[97] Nina N Niu, Zeba A Syed, Edward Krupat, Betty N Crutcher, Stephen R Pelletier, Helen M Shields, *The impact of cross-cultural interactions on medical students' preparedness to care for diverse patients*, 87 Academic Medicine 11 (2012), https://academic.oup.com/academicmedicine/article-abstract/87/11/1530/8352456?redirectedFrom=fulltext&login=false.

[98] *Id.*

[99] Texas Tech University Health Sciences Center El Paso, *Fall 2025 Enrollment* (2025), https://ttuhscep.edu/elpaso/oire/fact-book/2025-enrollment-fall.aspx.(last accessed June 30, 2026).

thus sidestepping the ordinary procedures for curriculum review at Texas Tech University Health Sciences Center El Paso.

145.    Like its sister institutions, administrators at Texas Tech University Health Sciences Center in El Paso did not even begin to engage the established curricular review process when the Creighton Memorandum I was issued.

146.    The curriculum review process at Texas Tech University Health Sciences Center El Paso normally begins with faculty submitting a Course Approval and Change Form to the university's Office of the Registrar.[100] The change request is then sent to the specific school's curriculum committee.[101] Each school has its own curriculum review process and recommendation policies which involve the schools' faculty, deans, and students.

147.    The curriculum review process at the Paul L. Foster School of Medicine begins with the Sub-Committee on Evaluation of Education Program.[102] The sub-committee consists of faculty members and a college mentor who regularly reviews the school's curriculum and makes recommendations for curriculum changes to the Curriculum and Educational Policy Committee.[103]

148.    The Curriculum and Educational Policy Committee has a three-year curriculum review cycle.[104] The committee consists of deans, mentors, faculty, and student representatives

---

[100] Tex. Tech Univ. Health Scis. Ctr. El Paso, *Operating Policy and Procedure: 59.01, TTUHSC El Paso Adding, Changing, and Deleting Courses and Changing Methods of Delivery* 2 (rev. Mar. 12, 2026), https://ttuhscep.edu/opp/_documents/59/op5901.pdf.
[101] *Id.*
[102] Tex. Tech Univ. Health Scis. Ctr. El Paso Paul L. Foster Sch. of Med., *Medical Education Program Policy: Sub-Committee on Evaluation of Education Programs* 2 (rev. Aug. 2024), https://ttuhscep.edu/som/ome/CEPC/_documents/Sub-Committee_on_Evaluation_of_Education_Programs_Policy_clean_8.12.2024.pdf.
[103] *Id.* at 1–2.
[104] Tex. Tech Univ. Health Scis. Ctr. El Paso Paul L. Foster Sch. of Med., *Medical Education Program Policy: Curriculum Review Cycle* 1 (rev. Dec. 2023), https://ttuhscep.edu/som/ome/CEPC/_documents/secure/Curriculum_Review_Cycle_Policy_clean_for_website_December2023.pdf.

and is "charged with the . . . revision of the undergraduate medical education curriculum" and "has the authority to set educational policy . . . [and] establish and approve curricular content."[105] In the first year of the cycle, the committee reviews the medical school's whole curriculum.[106] Off cycle, the committee receives reports from assistant deans with proposed course changes.[107] The committee has the sole discretion to review and approve these proposals and may only do so if there is a modification of the school's education goals, a change in course requirements reducing or eliminating content once identified as essential, or a change in outcomes associated with the curriculum itself.[108] The committee reviews curriculum and proposes changes by reviewing the sub-committee's recommendations, the school's goals and objectives, evaluation reports, syllabi.[109] The committee further works with the dean, faculty council, and other school committees on the change.[110] If the change is approved by the committee, the change goes to the Texas Tech University Health Sciences Center El Paso Academic Council.

149.    The Gayle Greve Hunt School of Nursing has a decentralized education program that "provide[s] authority to the individual academic committees to govern curriculum changes."[111] Curriculum modifications in the nursing school begins with the faculty or the school's executive leadership.[112] The faculty or executive petitions the Program Evaluation and Curriculum

---

[105] Tex. Tech Univ. Health Scis. Ctr. El Paso Paul L. Foster Sch. of Med., *Faculty Bylaws* 19 (Dec. 28, 2023), https://ttuhscep.edu/som/ome/CEPC/_documents/1-05_A_Faculty_Bylaws.pdf.
[106] Tex. Tech Univ. Health Scis. Ctr. El Paso Paul L. Foster Sch. of Med., *supra* note 104, at 2.
[107] *Id.* at 4.
[108] *Id.* at 5.
[109] *Id.* at 2.
[110] *Id.*
[111] Gayle Greve Hunt Sch. Nursing, *Faculty Bylaws* 1 (Sep. 2025), https://ttuhscep.edu/son/faculty-handbook/_documents/GGHSON_Bylaws_2025__Final_9.9.25.pdf.
[112] Tex. Tech Univ. Health Scis. Ctr. El Paso Hunt Sch. of Nursing, *Policy and Procedure 30.071 – Curriculum Revision Policy*, (Aug. 2022), https://ttuhscep.edu/son/_documents/SON-OP-30-071.pdf.

Committee to consider any change to the curriculum. The Program Evaluation and Curriculum Committee is the "primary developer, implementer, and evaluator of curriculum"[113] and includes five faculty members and three students.[114] If the committee approves the proposed curricular change, it is sent to the nursing school's faculty council for review and approval.[115] If the faculty counsel approve the proposed changed, it goes to university Academic Council for final approval.

150.    The curriculum review process at the Woody L. Hunt School of Dental Medicine and the L. Frederick Francis Graduate School of Biomedical Sciences would normally begin with the school's curriculum committees.[116] The committees work with faculty, deans, and other councils to make any proposed changes to the curriculum. Following approval by the committees, the change is sent to the university Academic Council.

151.    The proposed curriculum changes within the colleges are last reviewed by the Academic Council.[117] The voting members of the Academic Council include the Vice President for Academic Affairs, deans, faculty from each school, and the student government association president.[118] The Academic Council reviews the course change at its monthly meeting. Once approved, the course change is final.[119]

---

[113] *Id.*

[114] Gayle Greve Hunt Sch. of Nursing, *supra* note 111, at 5.

[115] Tex. Tech Univ. Health Scis. Ctr. El Paso Hunt Sch. of Nursing, *supra* note 112.

[116] Tex. Tech Univ. Health Scis. Ctr. El Paso Woody L. Hunt Sch. of Dental Med., *Faculty Bylaws* 11 (rev. May 30, 2023), https://ttuhscep.edu/sdm/faculty-affairs/_documents/bylaws/WLHSDM_Faculty_Bylaws_rev.drafts_5.09.23_approve.pdf; Tex. Tech Univ. Health Scis. Ctr. El Paso Francis Graduate Sch. Biomedical Scis., *Faculty Bylaws* 13–14 (Nov. 8, 2023), https://ttuhscep.edu/gsbs/_documents/20240111_APPROVED_Graduate_Council_FGSBS_Faculty_Bylaws_President_revisions_accepted_Online.pdf.

[117] Tex. Tech Univ. Health Scis. Ctr. El Paso, *supra* note 100.

[118] Tex. Tech Univ. Health Scis. Ctr. El Paso, *Operating Policy and Procedure: 10.06, Academic Council* 1–2 (May 28, 2026), https://ttuhscep.edu/opp/_documents/10/op1006.pdf.

[119] Tex. Tech Univ. Health Scis. Ctr. El Paso, *supra* note 100.

## V. Censorship of Classroom Instruction by the Creighton Memoranda.

### A. Formal Orders to Change Classroom Instruction

152.    Plaintiffs' members are directly and irreparably harmed by the unlawful restrictions on faculty teaching material that reference certain concepts of race, sexual orientation, or gender identity. Defendants have forced Plaintiffs' members to omit materials from their previously approved syllabi based on the presence of disfavored viewpoints prohibited in the Creighton Memoranda.

153.    By early May 2026, Defendants reviewed 8,500 courses at Texas Tech University, as stated by Dr. Ronald Hendrick, the Provost of Texas Tech University, on May 4, 2026, in a meeting with faculty. Provost Hendrick noted that 2,000 of the 8,500 courses were reported to "have some content relative to the memo we got on the first of December," referring to Creighton Memorandum I. Provost Hendrick further stated that his team "quickly determined" that most of those courses were not covered by the Creighton Memorandum I, narrowing the list of implicated courses to "700 plus courses." Of these 700+ courses, "200 plus courses" were covered by the student work exemption. According to Provost Hendrick, the Board of Regents' Academic, Clinical, and Student Affairs Committee would review the remaining 500 courses.

154.    Provost Hendrick further advised that the Board of Regents committee asked for syllabi for 75 of the 500 courses to review. Of these 75 courses, 30 were modified at the department chair, dean, or provost level of the Course Content Review Process. The Board of Regents committee made no further changes—beyond changes already made by department chairs, deans, and the provost—to those 30 courses. However, the committee requested additional changes to the remaining 45 courses.

155.    Plaintiffs' members are significantly impacted by these curricular restrictions.

Texas Tech administrators mandated that Plaintiffs' members modify the following Spring 2026 courses: English 2310: "Literature, Social Justice, Environment;" Spanish 5356: "Seminar in Hispanic Culture;" French 3303: "French Conversations;" French 5320: "Twentieth Century Literature;" Women and Gender Studies 5310: "Feminist Thought and Theory;" Dance 3309: "Pedagogy;" Dance 2313: "Dance Histories: 1850-Present;" and Philosophy 2300: "Intro to Philosophy," due to lack compliance with the Creighton Memoranda.

156.    Plaintiffs' Member #2, a professor of American Literature/Literature, Social Justice, and Environment at Texas Tech in Lubbock was censored from teaching certain books and providing instruction on race, racism and the Black experience in America. Member #2 founded and co-directs the Literature, Social Justice, and Environment Program (LSJE) in the Department of English, which includes a graduate concentration and undergraduate minor. Member #2's work focuses on the American West and Southwest, nature and environment, gender studies, speculative fiction, and critical indigenous and decolonial theory. Member #2's undergraduate, core English course: "Literature, Social Justice, Environment," was flagged for review because of several readings which purportedly implicated prohibited race and SOGI content. During the review process, Member #2 stated an intent to teach excerpts from *Between the World and Me*, by Ta-Nehisi Coates, a Pulitzer-Prize winning, non-fiction about the Black experience in America in the form of a letter to the author's teenage son, detailing the racism he faced growing up and its relationship to the American dream.[120]

157.    The Board of Regents banned the book, as well as other course content Member #2 planned to teach, from the university core. After reviewing Member #2's submission, the Board

---

[120] Michelle Alexander, Book Review, N.Y. Times (Aug. 17, 2015), https://www.nytimes.com/2021/10/21/books/review-between-the-world-and-me-by-ta-nehisi-coates.html (reviewing Ta-Nehisi Coates, *Between the World and Me* (2015)).

of Regents determined *Between the World and Me* "promotes the belief that meritocracy is a construct of oppression designed to exploit Black bodies" and, therefore, "directly violates the system's Prohibition of Prejudiced Advocacy." The Board further determined that, "[b]ecause this class is currently operated as a core undergraduate course, it is subject to absolute prohibition on SOGI content, and there are absolutely no exceptions to the Alternate Materials Rule." Member #2's course was marked for removal from core offerings for future semesters.

158.    In another example, Plaintiffs' Member #3 is an assistant professor of Spanish at Texas Tech University. Member #3 joined Texas Tech in 2019 and has taught in the Spanish and Portuguese department since joining. Member #3 teaches U.S. Latinx Literature, Border Studies, Latin American Film, and Culture of the Spanish Speaking World.

159.    Two of Member #3's courses, "A Seminar in Hispanic Culture: Chicana Praxis" and "Introduction to World Cinema," were implicated in the Spring 2026 Course Content review process. Member #3 flagged content from Chicana Praxis, Member #3's advanced graduate seminar (which focuses on theoretical writings by Chicana writers from the 1960s to the present) noting that all course activities utilize gender, sexuality, race, and ethnicity as crucial categories of analysis. That course aimed to "analyze the roles of gender, sexuality, race, and ethnicity in literary and visual works," according to the syllabus. Specifically, Member #3 flagged readings including, *Guadalupe Sex Goddess* by Sandra Cisneros, *La Virgen de Guadalupe and Her Reconstruction in Chicana Lesbian Desire* by Carla Trujillo, *Talkin' Sex* by Patricia Zavella, *Chicana Lesbians* by Carla Trujillo, *To(o) Queer the Writer* by Gloria Anzaldua, and *Still Loving in the (Still) War Year*s by Cherríe Moraga.

160.    Provost Hendrick emailed Member #3 on March 12 mandating that Member #3 "delay delivery of the content in question" until the Board of Regents rendered a decision on

potential violation of the Creighton Memoranda. On April 15, 2026, Provost Hendrick followed up: "This section, that was previously on hold, has been identified as needing modification," he wrote. "Please hold off on teaching this material."

161.    The Board of Regents conveyed to Member #3 that their entire course violated the Creighton Memoranda and mandated that Member #3 remove all seven texts because, in their view, these same instructional goals could be achieved using neutral materials that do not raise SOGI concepts.

162.    Specifically, in the Board of Regents' modification decision to Member #3, the Board of Regents stated:

> While the established directives provide specific academic exemptions for graduate-level coursework to explore theoretical frameworks and historical perspectives, the Alternate Materials Rule still applies. Because the broader instructional goals such as analyzing archetypes of Mexican femininity, exploring Chicana Praxis, and understanding indigeneity can be effectively achieved using alternative literature, units, or historical focuses that do not center on restricted themes, those neutral alternatives must be prioritized. Furthermore, the text by Lugones explicitly endorsing the recognition of multiple genders and arguing against the binary violates the foundational requirement to recognize only two sexes. Therefore, the instructor must modify the syllabus by replacing these specific SOGl-centered works with compliant alternatives.

163.    Another Plaintiffs' member (Member #4) holds a Ph.D. in Multicultural Women's and Gender Studies. At Texas Tech, Member #4 teaches courses in the Women and Gender Studies department. Member #4's graduate course, "Feminist Thought and Theories," was flagged for modification by the Board of Regents during the content review process. Member #4 was informed that artificial intelligence was used to scrape Member #4's syllabus to discern what readings could be out of compliance by including SOGI content and certain race-related material. Provost Hendrick told Member #4, in a March 12, 2026 email to "delay delivery of the content in question"

in Member #4's graduate course until the Board of Regents "renders a decision." Member #4

received the following guidance from the Board of Regents:

> [T]he flagged readings focus on queer theory, performativity, intersectionality, and critical frameworks regarding race and sex, meeting the threshold for content that is 'centered on' SOGI themes and controversial advocacy concepts. Because this is a graduate-level course, the inclusion of scholarly theories that conceptualize gender as a fluid spectrum or examine critical frameworks is expressly permitted. To maintain compliance with the Chancellor's directives, the instructor must ensure these concepts are explicitly situated and taught strictly as theoretical frameworks or analytical lenses rather than objective, scientific, or biological facts. Furthermore, any readings involving prohibited advocacy concepts must be presented rigorously alongside alternative scholarly perspectives without pressuring students to adopt or endorse them.

164.    The Creighton Memoranda mandated closure of the Women and Gender Studies

Program, as well as the Women and Gender Studies graduate-level certificate and undergraduate

minor further harm Member #4. The Women and Gender Studies program "serves as a central

source of information and support for gender-focused research, activities and academic

engagement at Texas Tech and beyond."[121] Member #4 is the only full-time instructor in that

department. Member #4 will lose employment because of the Defendants' censorship activities.

165.    Another Plaintiffs' member (Member #5) is a professor in the Department of

English and Modern Languages at Angelo State University. Member #5 had two courses that were

subjected to review by the Angelo State administration: one undergraduate upper-level course,

English 4330: "African American Literature," and one graduate English course, English 6341:

"American Drama." Both courses were flagged in the online review process because of content

related to sexual orientation. In Member #5's African American Literature course, the implicated

---

[121] *Women's & Gender Studies*, Tx. Tech Univ., https://www.depts.ttu.edu/wstudies/ (last visited June 29, 2026).

course material was *Lot* by Bryan Washington—a collection of short stories about the experiences of a young Black-Latinx boy who discovers that he is gay. In Member #5's American Drama course, two Broadway plays—*Angels in America*, a Pulitzer Prize and Tony Award winning drama by Tony Kushner, and *The Inheritance* by Matthew Lopez—were marked for censorship. Provost Topliff required Member #5 to remove content from the course, claiming that it violated the SOGI guidance portions of the Creighton Memoranda. Member #5 received the following guidance from the Provost about their English 4330 and English 6341 courses:

> Thank you for submitting your courses through the course content review process. Below is a summary of the courses submitted that you indicated have content related to advocating for a specific race or sex, there being more than two sexes, or sexual orientation. The following courses have been denied through the Course Content Review Process and will not be reviewed by the TTUS Board of Regents' Academic and Student Affairs Committee. As referenced in the Course Content Review Process Memo, this content is not approved; you need to adjust your course immediately to remove the referenced content. Please reach out to your Department Chair or Dean if you have questions.

166. In another example, Plaintiffs' Member #6, a professor at Texas Tech, was told upon inquiring about an upcoming Spring 2027 course, German 2312: "The Holocaust in Literature and Film," that the course would need to be removed from the core curriculum to run as it was in the past. In a May 19 email, the chair of this professor's department wrote to the professor to share information received from the Provost's office after Member #6 inquired about the fact that as currently structured, teaching about the Holocaust violated the Creighton Memoranda. The course "examines the Holocaust as represented in literature, film, and art." In part, due to the fact that the course satisfied a core requirement (Language, Philosophy, and Culture), the course saw high enrollment numbers. Its core designation meant the course should focus on how "ideas, values, beliefs, and other aspects of culture reflect and affect human experience." Each week of

the course approached a different aspect of Holocaust history and remembrance. Week three, for example, taught "Antisemitism in Europe." Weeks six and seven taught about "Life in the Concentration Camps." Week thirteen taught about "Postmemory."

167. Week four taught about "Different Victim Groups." Alongside millions of Jews, gay and bisexual men were persecuted and murdered by the Nazi regime.[122] The Nazi party targeted the thriving gay culture in Germany.[123] The Ackerman Center for Holocaust Studies at the University of Texas at Dallas estimates that as many as 100,000 people were arrested for alleged gay or bisexual behavior by the Nazis.[124]

168. The Creighton Memoranda purportedly bars Member #6 from teaching facts about the Nazi persecution of gay and bisexual men during the Holocaust in a core course because that subject matter is considered to be SOGI material, which the Creighton Memoranda bar from instruction absent an exception, which was not given. Member #6 was told that the solution found by the Provost's office is to remove the material or remove the core designation from the course.

169. Member #6 also taught two courses in the Spring of 2026 that required modification while they were being taught: a graduate seminar in French, and an upper-level undergraduate course in French. Member #6 flagged the entire graduate course, French 5320: "Twentieth Century Literature," for review, noting that a section of the course looked at "queer time" and

---

[122] *Homosexual Victims of Nazi Persecution*, Nat'l Holocaust Museum, https://www.holocaust.org.uk/news/homosexual-victims-of-nazi-persecution (last visited June 29, 2026).

[123] *Life Before the Holocaust Pre-war Homosexual Life,* Holocaust Explained, https://www.theholocaustexplained.org/life-before-the-holocaust/pre-war-homosexual-life/ (last visited June, 29, 2026).

[124] Nils H. Roemer, Katie Fisher, & Yannis Soonjung Kwon, *Persecution of Homosexuals at Dachau Concentration Camp,* Ackerman Ctr. For Holocaust Stud., https://ackerman.utdallas.edu/study/persecution-of-homosexuals-at-dachau/ (last visited June 29, 2026).

"ecofeminism" and other narratives that discuss gender identity and sexual orientation.

170.    In an email sent on April 15, 2026, Provost Hendrick told Member #6 to "hold off on teaching" material in the course because the Board of Regents decided the course required modification to comply with the Creighton Memoranda. In a reply, Member #6 lamented that there was only one class meeting remaining—writing that delaying instruction per the instruction would mean the material would go untaught and "my courses . . . censored."

171.    On May 6, 2026, after the final class, Member #6 was notified by the Board of Regents that the following books could not be taught because their lessons did not comply with the Creighton Memoranda:

- *L'Opoponax*, Monique Wittig, Week 3. This text explores concepts beyond binary gender structures in violation of the requirement to recognize only two sexes, and instructional goals regarding coming of age stories can be achieved using alternative novels.
- *Les Annees*, Annie Ernaux, Weeks 4 to 5. This work focuses on sexual orientation, and instructional goals regarding collective temporal experience can be achieved using alternative historical or memoir based materials.
- *Petite Maman*, Celine Sciamma, Week 9. This film explores queer time, and the instructional goal of studying circular or impossible time can be achieved using alternative fantasy or time travel films that do not rely on gender identity or sexual orientation frameworks.
- *Desorientale*, Negar Djavadi, Weeks 11 to 12. This text focuses on sexual orientation and reproductive justice, and instructional goals regarding traumatic temporality can be taught using alternative immigrant narratives without these restricted focuses.
- *Partout le feu*, Helene Laurain, Week 14. This text utilizes a sex based ecofeminist framework, and instructional goals regarding climate urgency can be achieved through neutral alternative materials that do not involve sex-based activism.
- *Le chant de la riviere*, Wendy Delorme, Week 15. This text relies on a gendered ecofeminist framework, and instructional goals for studying deep time can be met using neutral alternative materials.

These AI-generated explanations do not necessarily accurately represent theses texts. Descriptions such as "sex-based ecofeminist framework" and "gendered ecofeminist frameworks," for instance, refer to concepts that do not exist. This decision also censors Member #6 from teaching this material the next time they plan to teach their class—which they plan on teaching again.

172.    In another example, Plaintiffs' Member #7, a medical doctor and professor at Texas Tech Health Sciences Center in Lubbock, was required by Texas Tech administrators to remove any material from their coursework that discussed transgender or intersex patients, even though those patients were a vital part of this professor's course and the course is part of the medical school's core curriculum. All of the course material this professor was asked to remove was necessary for the medical certification exams that medical students are required to take. Member #7 received this instruction from the Office of Curriculum immediately after the university disseminated Creighton Memorandum I, even though Creighton Memorandum I stated that course material for licensure was permitted and did not require modification.

173.    And at a different institution, another Plaintiffs' Member #8, who is a medical professional and instructor at Texas Tech Health Sciences Center in El Paso, focuses on population health issues. Member #8 has censored content in their coursework about underserved populations and instructed by Texas Tech Health Sciences Center in El Paso administrators not to use the word "disparity" when teaching and training future medical professionals about patient care. However, Member #8 believes they need to acknowledge disparities to train future medical professionals adequately. For example, "El Paso County residents experienced, on average, more physically unhealthy days and more frequency physical distress than the average Texas citizen and the nation as a whole."[125] "In El Paso County, the diabetes prevalence rate is higher than the state and national

---

[125] *Id.* at 32.

average, with 15.3% of the population in El Paso living with diabetes compared to 12.3% in Texas and 11.6% in the US."[126] Cervical cancer mortality rates among women along the Texas-Mexico border are higher than for women living in non-border counties in Texas—notable because cervical cancer is usually preventable with screening.[127] Among children, "hospitalizations for asthma were 36% higher for those living in border counties as compared to children living off the border. The disparities were even greater for Hispanic children, who faced a 64% increase in odds of hospitalization for asthma if they lived in the border region, as opposed to off the border."[128]

174.   In addition, Member #8's ability to teach health outcomes using terms like disparities is important given the demographic profile of El Paso. For example, the military base Fort Bliss, which directly borders the City of El Paso and has a population of 11,000 residents, is estimated to be 17.6% Black, nearly 30% greater than the share of Black residents statewide in Texas. Black women also experience significant health disparities across Texas. Among the starkest disparities, Black women in Texas have a 2.5 times higher pregnancy-related mortality rate than white women in Texas.[129] Furthermore, "Black women are 1.48 times more likely than White women to die from breast cancer within the United States."[130] This is partially because

---

[126] *Learn More About Diabetes*, El Paso Ctr. for Diabetes, El Paso Ctr. for Diabetes, https://epdiabetes.org/resources/learn-more-about-diabetes (last visited July 3, 2026).

[127] Thelma Carrillo et al., *Predictors of timely diagnostic follow-up after an abnormal Pap test among Hispanic women seeking care in El Paso, Texas*, 21:11 BMC Women's Health 1, 1–2, https://pmc.ncbi.nlm.nih.gov/articles/PMC7788782/ [doi: 10.1186/s12905-020-01161-9].

[128] Sara E. Grineski et al., *Social Disparities in Children's Respiratory Health in El Paso, Texas*, 11 Int'l J. of Env't Rsch. Pub. Health 2941, 2942 (2014), https://pmc.ncbi.nlm.nih.gov/articles/PMC3987014/  [doi:10.3390/ijerph110302941].

[129] Tex. Maternal Mortality & Morbidity Review Comm. & Tex. Dep't of State Health Servs., *Joint Biennial Report 2024* 12 (2024), https://www.dshs.texas.gov/sites/default/files/legislative/2024-Reports/MMMRC-DSHS-Joint-Biennial-Report-2024.pdf.

[130] Hazif Khan et al., *Disparities in Breast Cancer Survivors in Rural West Texas*, 28 Cancer Control 1, 2 (2021), https://pmc.ncbi.nlm.nih.gov/articles/PMC8419545/ [doi: 10.1177/10732748211042125].

"Black and Hispanic women are 30–60% more likely to be diagnosed with breast cancer greater than stage II compared to WNH [white non-Hispanics] and are more likely to receive inappropriate treatments."[131] Specifically in West Texas, Black and Hispanic women have a higher age-adjusted breast cancer mortality rate than Texas as a whole.[132] Member #8's ability to train medical professionals is tied to the ability to use accurate vocabulary and jargon about their community.

175.    In addition to censorship related to race about the term "disparities," Member #8 at Texas Tech Health Sciences Center in El Paso is fearful and censored content related to ensuring that LGBTQIA patients receive comprehensive and inclusive care because of the Creighton Memoranda.

**B. University Administrators' Confusion and Ambiguity About Compliance With the Creighton Memoranda**

176.    Texas Tech System administrators have experienced confusion and been unable to advise Plaintiffs' members about satisfying Creighton Memoranda prohibitions since their inception across the Texas Tech system.

177.    For example, at Angelo State, faculty and administrators experienced immediate confusion about the Creighton Memorandum's applicability. In December 2025, right after Creighton Memorandum I was issued, Provost and Vice President for Academic Affairs, Dr. Don Topliff, could not answer faculty questions about what topics and textbooks discussing sexual orientation professors should disclose.[133]

178.    Also, in December 2025, Dr. Topliff stated that professors should not be surprised if students submit complaints and record the professor's instruction if they mention their spouses

---

[131] *Id.* at 8.

[132] *Id.* at 2.

[133] Angelo State Univ., *ASU Faculty Senate Meeting Minutes* 2 (Dec. 3, 2025), https://www.angelo.edu/live/files/29758-meeting-minutes-12-3-2025.

during class.[134] He then advised faculty to report the course for discussing sexual orientation if the professor discusses any type of sexual relationship in the classroom.[135]

179.    In February 2026, following the review of spring courses, the Board of Regents sent several courses back to Angelo State for the removal of content or the whole course.[136] Dr. Topliff stated that they "have not required any course not be taught and have given faculty the opportunity to alter the course."[137] For those courses that were sent back to the university, the administration permitted instruction and planned to appeal the Board's decision.[138] However, it was clear that implicated faculty may still face consequences for teaching the banned content pending appeal. Dr. Topliff stated that the university administration is "not trying to censor anything, [but instead]… are trying to keep you out of trouble. How bad do you want to have a news reporter come to your room as you leave and ask why you are teaching something that is illegal."[139]

180.    In March 2026, a faculty member asked for clarification on the term "advocate," and whether it is advocacy for a faculty member to merely identify as part of a specific race or gender. Dr. Topliff and President Hawkins could not provide this faculty member a direct answer.[140]

181.    In April 2026, the university circulated trainings on race, sex, and sexual identity

---

[134] *Id.*

[135] *Id.*

[136] Angelo State Univ., ASU Faculty Senate Meeting Minutes 1 (Feb. 4, 2026), https://www.angelo.edu/live/files/29771-meeting-minutes-2-4-2025.

[137] *Id.*

[138] *Id.* at 2.

[139] *Id.*

[140] Angelo State Univ., *ASU Faculty Senate Meeting Minutes* 3 (Mar. 4, 2026), https://www.angelo.edu/live/files/29816-meeting-minutes-3-4-2026.

and "yes" or "no" questions to facilitate course review of the summer and spring semesters.[141] Faculty still had confusion about the Creighton Memoranda's applicability as they prepared to submit approval for summer and fall courses.[142] Faculty asked whether they should resubmit courses already approved for spring and whether they should teach their summer courses that may still be awaiting approval for its similar spring course.[143] Dr. Topliff did not have concrete answers to these questions.

182.    In April 2026, Dr. Topliff advised faculty teaching during summer to "[a]void the topics under review until they are reviewed."[144] He stated faculty should ensure the course content is "[a]bsolutely educationally necessary" and instructed them to make "sure you are not advocating for something" in anticipation of the summer evaluation.[145]

### C. Plaintiffs' Members Experienced Confusion and Ambiguity about compliance with the Creighton Memoranda.

183.    Plaintiffs' members are confused about the Creighton Memoranda even post implementation. For example, Member #1, has experienced confusion surrounding Creighton Memorandum I's vague definition of race and sex-based prejudice. Member #1 serves as a Professor of Political Science at Angelo State University and has taught at Angelo State for more than 20 years. Member #1 teaches a class in the Department of Political Science titled "Federal Government." The course covers the origins and development of the United States Constitution, the structure and powers of national government, and the expansion of civil liberties and civil rights. The course also discusses issues of race, slavery, and political violence. These are objective,

---

[141] Angelo State Univ., *ASU Faculty Senate Meeting Minutes* 1 (Apr. 1, 2026), https://www.angelo.edu/live/files/29817-meeting-minutes-4-1-2026.

[142] *Id.* at 2.

[143] *Id.*

[144] *Id.* at 1.

[145] *Id.* at 2.

historical components of American history.

184.    Member #1 reviewed the Angelo State Portal Form and determined not to have any coursework that implicated any race or sex-based prejudice and thus checked "no on the form." However, on February 27, 2026, Member #1 had a meeting with university administrators, their department chair Dr. Tony Bartl and Dr. Sergio Ruiz, Dean of the College of Arts and Humanities, who stated that students have complained about Member #1's teaching based on the guidance from Creighton Memorandum I. Specifically, Dr. Bartl said, "And, so as it appears to me, um, looking through the course content, both the lectures that you published and some reports from a student, is that there's a few categories that need to be addressed here. One is that, and this would also not likely be under my purview, but there's some question about whether the issues of race and gender in the recent course content review were properly disclosed."

185.    Dean Ruiz stated that the President's office reviewed the lectures prepared and asked the department chair, Dr. Bartl, to assist with the course review. Member #1 pre-published five lectures' notes on the university's Blackboard page prior to the start of the semester, which the administrators had access to. The titles of those five lectures included, "Basic Concepts of Politics, Capitalism or Democracy, Ideology, Political Culture, and Political Violence." Member #1 received instruction by administrators at Angelo State to modify the lectures despite the absence of any advocacy or promotion of any race or sex-based prejudice in their lecture notes or course content and university administrators could not explain to Member #1 how their content implicated Creighton Memorandum I.

186.    Plaintiffs' members at Texas Tech also experienced confusion over how to comply with the Creighton Memoranda. For example, Plaintiffs' Member #9 is an Assistant Professor of Practice in the English Department at Texas Tech. Member #9 teaches two courses: English 2382:

"Heroes and Anti-Heroes" and English/Women and Gender Studies 3382: "Women Writers: The Language of Global Feminist Manifestos" (cross listed in the Women & Gender Studies program). Member #9's "Heroes and Anti-Heroes" course introduces students to the critical study of heroes, antiheroes, and villains from multiple genres, periods, and traditions, with attention to aesthetics, ideas, and values. Member #9's "Heroes and Anti-Heroes" course is a core-level undergraduate course.

187.    After submitting the Creighton Memoranda questionnaire for "Heros and Anti-Heroes," Member #9 was contacted after-hours by the department chair and instructed to further revise their submission so that the course did not mention SOGI. The department chair requested that Member #9 modify content referencing transgender identity, but that other content related to heterosexuality, womanhood, and marriage did not require modification because that content could be framed as content on gender roles and constructions of gender. Member #9 was given until 8:00 am the following morning to comply and felt immense pressure to censor the course material. Member #9 replaced one of the novels in the course, *The Silence of the Lambs*, which contained medical discourse surrounding transgender themes. Member #9 removed this novel because of their department chair's request to remove the material, even though the character in question never explicitly self-identifies as transgender.

188.    Member #9 complied because in a meeting Vice Provost Genevive Durham DeCesaro verbally threatened Member #9, as well as other professors, with disciplinary action for non-compliance, up to and including termination. Member #9 thus felt their only option was over-compliance and to censor material that, in Member #9's belief, only potentially violated the Creighton Memoranda's unclear terms.

189.    Member #9's other course, "Women Writers," examines significant works by

women, with an emphasis on the manifesto as a literary genre and form of political writing. Member #9's students read feminist manifestos (historical and contemporary, US and global) and paired essays on rhetoric and language. Member #9's course is not a core curriculum course. Nearly all the course's content centers on gender, gender identity, and sexual orientation. To preempt adverse action against the course, Member #9 emailed and met with administration and expressed that they would not be able to modify the course.

190.    After review by the Texas Tech Provost and Texas Tech President, Member #9 was allowed to teach the course as planned because, the administrators said, it essentially would be too drastic of an act of censorship to ban it. The administrators approved the course because banned concepts were "referenced explicitly within a disciplinary context (literature)" and "included throughout the semester, making removal or rescheduling impossible." "Considering these points, the Texas Tech Provost and Texas Tech President elected to approve the continued delivery of the course as scheduled in order to avoid canceling this course and negatively affecting all enrolled students." It is not clear if Member #9 will be allowed to teach their course again.

191.    In another example, Plaintiffs' Member #10 is a historian of the post-Reconstruction United States. Member #10 is associate faculty in the Department of History at Texas Tech University, which they joined in May 2023. In the Spring of 2026, Member #10 taught the graduate seminar History 5335: "Studies in U.S. Labor" and the undergraduate honors course, History 4308: "United States Urban and Immigration History: Honors." For Member #10's graduate seminar, the day before the first class, Member #10 sent a message to the new class, attaching the syllabus and explaining the "university was forced to set up a censorship portal with a form every faculty member must complete stating whether their course material 'advocates race- or sex-based prejudice'; and whether any course materials mention gender, sexuality, and/or more

than two human sexes." Member #10 noted the threat of disciplinary action they would face for noncompliance. Member #10 shared this information with students because they "all have paid good money to take classes at Texas Tech University, and . . . deserve to know what is happening to [their] education."

192.    Member #10 told the students that the course material did not advocate for the idea that one race is superior; but "we are clearly on the edge of a 'forbidden' topic." Member #10 further noted, "A few times during the semester readings have explicitly focused on the experiences of women, and how these experiences AS WOMEN were different from men's. Those readings are now 'under review,' and one will frankly be censored, as you'll see in the syllabus." Member #10 removed, for example, Seth Rockman's book *Scraping By* because it talks about wage disparities based on gender. The book is an account of wage labor in post-Revolutionary Baltimore that examines how race, sex, nativity, and legal status determined economic activities. But Member #10 felt they had to report the book because of how it dealt with gender. Given the vagueness of Creighton Memorandum I, Member #10 felt that, because of the uncertainty, Member #10 had to report it and censor themselves from teaching it under the extraordinary threat of termination from the university. Because Member #10 teaches history courses that are taught in chronological order, delaying instruction on, for example, Rockman's book meant that Member #10 skipped the lesson altogether.

193.    For Member #10's undergraduate immigration course, Member #10 introduces students to foundational analytical concepts, distinguishing immigration from migration, and mapping the intersections of race, ethnicity, and citizenship. Member #10 teaches these concepts as inseparable from discussions of racial and ethnic identity, the evolution of U.S. naturalization law, and the shifting racial classifications embedded in, for example, census categories. Member

#10 censored teaching about core themes in their immigration class because of the Creighton Memoranda and fear of discipline. Member #10 felt the need to curb their speech when teaching about slavery, the Industrial Revolution, racialized labor markets, or Supreme Court decisions determining citizenship for Japanese immigrants, among other topics because of Creighton Memoranda's vague prohibition.

194.    Another Plaintiffs' member (Member #11) at Texas Tech checked "no" to all of the questions included in the content review portal for their class submission for their dance class titled, "Pedagogy." But pursuant to Creighton Memorandum II, Member #11 was asked to remove books from their course. Dr. Hendrick, the Texas Tech provost, informed Member #11 that Member #11 would need to "hold off" on teaching the content, including *Teaching to Transgress* by bell hooks because it potentially violated the race-based advocacy provision of the Creighton Memoranda. The Texas Tech provost's office later informed Member #11 that their course required modification because it frames "standard educational structures as constructs of oppression based on race or sex." Member #11 is confused because Member #11 does not understand how talking about structural oppression meets any of the divisive concepts in the Creighton Memoranda.

195.    In a meeting with a Texas Tech administrator, Member #11 was also asked to remove the word "systemic" from the "Pedagogy" class syllabus. Specifically, Member #11 was asked if they were "able to say the same thing without saying 'systemic barriers.'" The Texas Tech administrator clarified, "That word, that one is going to be a trigger word for them [referring to the Board of Regents]." Member #11 was confused and asked for wording suggestions because that language is used by all the scholars and educators throughout their field. Member #11 also asked if removing "systemic" from Member #11's syllabus would prevent Member #11 from being

able to say the word "systemic" in class. The Texas Tech administrator was unable to answer Member #11's question and both expressed confusion over the Creighton Memoranda's requirements.

### D. Plaintiffs' Members Inconsistent and Arbitrary Censorship Because of the Creighton Memoranda.

196. Plaintiffs' members experience divergent applications of policy under the Creighton Memoranda for seemingly arbitrary reasons. For example, Member #2 at Texas Tech, who teaches a core undergraduate class in the English department, was required to fully censor excerpts of *Between the World and Me* by Ta-Nehisi Coates, which touches on several concepts about anti-racism. Meanwhile, Plaintiffs' Member #12, who similarly teaches an undergraduate core-level course in philosophy, received explicit permission from university officials to use *How to Be an Antiracist* by Ibram X. Kendi and *What Should White People Do?* by Linda Martin Alcoff in their course materials. The materials for classes taught by both Plaintiffs' members cover similar contemporaneous discussions of racism and the Black American experience and are taught under the identical policy rules as undergraduate core level courses. Yet they arbitrarily experienced divergent approval results.

197. Examples of inconsistency can also be seen within the same syllabus. For example, Member #6 received notification to remove content about sexual orientation from the French 3303: "French Conversation: Popular French Music" class because the course materials explicitly "utilize French popular music specifically focused on sexual orientation and gender fluidity to teach language skills, meeting the threshold for content that is 'centered on' SOGI themes." Because this is an undergraduate course focused on language acquisition, none of the specific academic exemptions, such as the Historically Intrinsic or Public Policy exemptions, apply to these conversational materials. Consequently, the instructor must strictly adhere to the Alternate

- 71 -

Materials Rule by replacing these SOGI-focused songs with neutral, alternative materials to achieve the core instructional goals of vocabulary expansion and oral fluency. The Board of Regents required Member #6 to remove four songs focused on gay, lesbian or queer relationships/identities. However, Member #6 was not instructed to remove any songs based on heterosexual relationships such as "J'aime les filles" [I like girls] and "Tous les garçons et les filles" [All the boys and the girls]. Member #6 is confused because the Creighton Memoranda does not define sexual orientation to exclude heterosexual orientation.

198.    In still another course taught by one of Member #6's courses, French 5320: "Troubled Temporalities and Formal Experiments in 20th- & 21st-century French Literature and Film," they were asked to remove a novel, *L'Opoponax* by Monique Wittig because "this text explores concepts beyond binary gender structures in violation of the Creighton Memoranda." However, the course has a unit on queer identity, discussing Marcel Proust's *Swann's Way* and *Sodom and Gomorrah*, that was not flagged as needing modification even though it directly implicated SOGI material.

199.    The Creighton Memoranda's policy exempting upper level, non-core undergraduate courses and graduate level courses from the broader "alternative materials requirement" has further led to confusion among Plaintiffs' members. The exceptions listed in section 6 of the "alternative materials requirement" rules allow for graduate courses to center on SOGI topics. Yet, some of Plaintiffs' members had to modify their graduate coursework to remove references to SOGI while others did not.

200.    For example, Plaintiffs' Member #13 is an Associate Professor of Restoration and Eighteenth-Century British Literature at Texas Tech University and teaches a graduate-level course accordingly titled "Studies in Restoration and Eighteenth-Century British Literature." In

the review process, Member #13 flagged several gothic novels that explore romantic relationships, gender roles, courtship expectations, and feminist literary critiques in the context of broader literary and historical study. The Board of Regents determined that the specific text, "The Character in the Veil: Imagery of the Surface in the Gothic Novel" by Eve Kosofsky Sedgwick is "centered on sexual orientation and queer theory, and instructional goals regarding Gothic conventions and characterization can be achieved through alternative, neutral scholarly works that do not focus on sexual orientation."

201. Nevertheless, the Board determined that because "course content includes SOGI themes as contextual components of a broader literary and historical study [and] [b]ecause the analysis of historical societal norms and traditional relationships does not violate the foundational baseline of recognizing two sexes, these primary texts are fully permitted. Furthermore, as a graduate-level course, the inclusion of modern scholarly criticism—such as feminist theory or queer readings of historical texts—is explicitly allowed."

202. In addition, Member #4's teaching the graduate-level course, Women & Gender Studies 5310: "Feminist Thought and Theories," course was allowed to teach materials centering SOGI "[b]ecause this is a graduate-level course, the inclusion of scholarly theories that conceptualize gender as a fluid spectrum or examine critical frameworks is expressly permitted."

203. On the other hand, Member #3 who teaches a graduate level seminar in Hispanic culture titled "Chicana Praxis" was forced to remove the material referencing SOGI. The Board wrote, "[w]hile the established directives provide specific academic exceptions for graduate-level coursework to explore theoretical frameworks and historical perspectives, the Alternate Materials Rule still applies. . . . Therefore, the instructor must modify the syllabus by replacing these specific SOGI-centered works with compliant alternatives." Thus, some Plaintiffs' members have received

- 73 -

the graduate-level coursework exemption for SOGI-centered content while others did not for inexplicable reasons.

204.    On its face, the different rulesets for graduate and undergraduate level courses are likewise arbitrary. Plaintiffs' members are barred from teaching undergraduate students about gay and bisexual victims of the Holocaust. Plaintiffs' members, in theory, teach identical content at the graduate level without issue.

205.    Plaintiffs' members further experience confusion and ambiguity around how to interpret the Creighton Memoranda's policy on incidental references to SOGI content. Specifically, section 6 of Creighton Memorandum II states, "[i]ncidental references should be avoided when selecting primary materials for core courses. If an adopted, industry-standard text includes SOGI content, instructors are not required to physically redact the text, but they must not highlight, assess, or allocate instructional time to it." This provision requires Plaintiffs' members to avoid incidental references to SOGI when selecting instructional material but does not require redaction of SOGI references within "industry-standard text" so long as such themes are not emphasized during instruction. Therefore, not all incidental references appear prohibited even though the Memorandum does not say so explicitly. Nowhere is the term "industry-standard text" defined within the Creighton Memoranda. Instead, Plaintiffs' members are required to guess whether their text qualifies as such.

206.    For example, Plaintiffs' Member #14 was instructed to remove *The Republic* by Plato from the Philosophy 2300: "Beginning Philosophy" class because it references Plato's beliefs concerning gender roles and homosexuality. Member #14 is an Associate Professor of Philosophy at Texas Tech University who teaches epistemology, ethics and metaethics. Member #14's beginning Philosophy class aims to teach "discussions of core philosophical concepts like

justice, instrumental and final value, virtue, knowledge and courage." Instructional materials are used to "train students to reconstruct, evaluate, and respond to arguments."

207. No instruction time is dedicated to Plato's specific views on gender and sexuality and any reference to such occurs only in passing. The Philosophy Department did not recommend removing the material because "[r]eading Plato's *Republic* is a standard part of Philosophy curriculum and his views of sex and gender cannot be avoided." The Provost likewise recommended the same stating that, "[t]his philosophy course engages students with core philosophical texts, including Plato's Republic . . . . Discussion of gender and sexual orientation appears as part of interpreting historically and philosophically significant works rather than as a separate focus."

208. Nevertheless, the Board of Regents instructed Member #14 to remove Plato's *Republic* from the course because "texts like Plato's *Republic* . . . explore themes of homosexual love, gender identity, and prejudice, which categorizes the material as including Sexual Orientation and Gender Identity (SOGI) themes. . . . subject to the system's absolute ban on SOGI content in core undergraduate courses." At no point within the modification decision did the Board discuss whether *The Republic* constitutes an industry or disciplinary standard text. Again, the Creighton Memoranda do not define the term "industry standard text." Member #14 believes, based on expertise in the field, that a text as seminal to the study of philosophy as Plato's *Republic* constituted a permissible discipline-standard or "industry-standard text" so long as SOGI themes were not emphasized during instruction.

209. Another example of Plaintiffs' members experiencing confusion around the implementation of the Creighton Memoranda's policy on incidental references is the Board requiring Plaintiffs' Member #15 to modify material in their course "Survey of Pop Music."

Member #15 is an Instructor of Record in the Music Humanities division in the Fine Arts Doctoral Program at Texas Tech University.

210.    Within this course, "[s]tudents are asked to listen to music, read about music, discuss music, write about music, and create music." "Popular music often includes lyrics that sometimes discuss romantic relationships and/or aspects of sexual orientation," but Member #15 does not dedicate any instructional time to specific discussion on SOGI themes.

211.    The flagged works by the Board of Regents include a chapter with a brief reference to androgynous stage personas (e.g., Alice Cooper, Kiss, David Bowie) as part of a discussion on performance style and visual branding in rock and metal music. Another flagged chapter discusses the role of urban nightlife, club culture, and LGBT community involvement in the history of disco music. References to SOGI themes only occur within historical discussions of artist style and the cultural history of disco music. The Provost recommended non-removal of the material because "[r]eferences to romantic relationships, identity, and sexual orientation appear within song lyrics and related materials as common themes in popular music and are analyzed as part of understanding musical meaning and cultural expression."

212.    The Board of Regents disagreed and required removal stating, "[t]he directive explicitly dictates that there are no exceptions to the Alternate Materials Rule for core, undergraduate courses. Course content at this level must not center on or include SOGI content, and even incidental references must be removed or avoided." The Board of Regent's decision implemented the prohibition on incidental references provision of the Creighton Memoranda that required Member #15 to remove material even though they did not emphasize SOGI themes.

213.    Plaintiffs' Member #7 at Texas Tech University Health Sciences Center in Lubbock received initial instructions from the Office of Curriculum that they could no longer treat

transgender patients in the presence of medical students, including for non-gender affirming care health concerns. This instruction ran afoul of the guidance in the text of Creighton Memorandum I as it exempted clinical curriculum such as patient care. In an apparent effort to fix that, Member #7 were subsequently informed by a supervisor that 1) no student could knowingly be part of the care of a transgender patient, and 2) under no circumstances could this professor discuss caring for transgender patients with their students. Member #7 was also told that if a medical student was in an exam room with a patient and realized that the patient was transgender, the student was required to excuse themselves from the room and terminate care. Alternatively, if medical school staff found out that the patient was transgender, they were required to enter the exam room and pull the student out themselves. The verbal guidance this professor received was framed as: "Better safe than sorry." This meant that if a transgender patient came into a clinic with hypertension, migraines, or cancer, Member #7 could not treat them in the presence of their medical students.

214.    Member #7 later received notification in March 2026 that students could treat transgender patients during their third- and fourth-year clinical rotations. But medical students from December 2025 to March 2026 will never again have access to this training, because their rotations have already passed. Due to the vagueness of the Creighton Memoranda, Member #7 lost the ability to train and provide medical students with experience treating patients with a variety of medical conditions solely because of the patient's gender identity as transgender. Member #7 still cannot teach students about any health issues related to transgender individuals during the first two years of the student's medical education, meaning Member #7's students will enter clinical rotations without any medical education on patients they later will be expected to treat. Conversely, multiple Plaintiffs members at Texas Tech Health and Science Center had to submit similar curriculum but were permitted to teach without modification because the Creighton Memoranda

deemed the curriculum to meet the requirements of board certification.

## CLAIM FOR RELIEF

### COUNT ONE

### First Amendment to the U.S. Constitution
### Speech Free from Viewpoint Discrimination 42 U.S.C. § 1983

215.    Plaintiffs, on behalf of their members, incorporate and re-allege each and every allegation contained above as if fully set forth herein.

216.    The First Amendment, as applied to the states through the Fourteenth Amendment and enforceable pursuant to 42 U.S.C. § 1983, provides in part that the government "shall make no law . . . abridging the freedom of speech."

217.    The Supreme Court has established—and the Fifth Circuit has reiterated—that academic freedom is a special concern of the First Amendment, which does not tolerate laws that cast a pall of orthodoxy over the classroom. Accordingly, classroom discussion is protected speech when it is a matter of public concern.

218.    Whether the professors' speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.

219.    Speech involves a matter of public concern when it involves an issue of social, political, or other interest to a community.

220.    In the university classroom context, speech that serves an academic purpose and is at least tangentially related to classroom instruction is considered of public concern.

221.    The Creighton Memoranda prohibit professors from discussing or teaching certain viewpoints related to race, sexual orientation, and gender identity because those viewpoints are disfavored by Defendants.

222.    Yet conversely, these instructors are allowed to provide instruction with viewpoints that denounce the same concepts because those viewpoints are favored by Defendants.

223.    The speech prohibited by the Creighton Memoranda constitutes protected matters of public concern.

224.    Through the Creighton Memoranda, Defendants have chilled the speech of Plaintiffs' members, who are forced to modify their reading lists, exclude instruction and classroom discussion on certain subject matters, refrain from evaluating students on certain skills or expertise, and otherwise deprive students of the full range of academic scholarship, expertise, and opinions that they would otherwise provide in their courses in public universities.

225.    Thus, Plaintiffs' members in the Texas Tech system have been directly harmed by the censorship and curriculum restrictions implemented by Chancellor Creighton and the Texas Tech Board of Regents.  The Court should declare those restricts unlawful and enjoin Defendants from enforcing them.

**COUNT TWO**

**Fourteenth Amendment to the U.S. Constitution**
**Void for Vagueness 42 U.S.C. § 1983**

226.    Plaintiffs, on behalf of their members, incorporate and re-allege each and every allegation contained above as if fully set forth herein.

227.    The Due Process Clause of the Fourteenth Amendment, enforceable pursuant to 42 U.S.C. § 1983, provides that "[n]o state shall . . . deprive any person of life, liberty, or property, without due process of law."

228.    A law is unconstitutionally vague in violation of the Fourteenth Amendment if it fails to provide adequate notice of the proscribed conduct and authorizes or encourages arbitrary

enforcement.

229. A severe enforcement mechanism lessens the degree of tolerable vagueness.

230. To the extent a law intrudes upon an area protected by the First Amendment, standards of permissible vagueness are strict, and the government may regulate the matter only with narrow specificity.

231. A law is void for vagueness if its prohibitions are not clearly defined. Further, a law is impermissibly vague if it either fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits or authorizes or even encourages arbitrary and discriminatory enforcement.

232. The Creighton Memoranda are facially unconstitutionally vague because their language confuses educators about how they must follow or implement the guidance.

233. There are no clear parameters for conduct that constitutes a violation subject to discipline and no clear parameters on what instructors must do to remain in compliance.

234. Likewise, the Creighton Memoranda are unconstitutionally vague, as applied, because decisions by those implementing the Creighton Memoranda demonstrate how those tasked with enforcing their mandates, as well as those subject to those mandates, struggle to understand what is and is not prohibited.

235. This web of confusing, conflicting, and seemingly random and arbitrary enforcement and interpretations of the Creighton Memoranda shows that guiding language fails to provide sufficient specificity as to what the Creighton Memoranda prohibit and how it should be enforced.

236. The lack of sufficiently discernible terms and prohibitions in the Creighton Memoranda results in enforcement that is arbitrary and inconsistent, which invites discrimination

and violates the due process rights of Plaintiffs' members.

237.   Plaintiffs' are entitled to a declaratory judgment that the Creighton Memoranda are unconstitutional and void for vagueness, and to injunctive relief enjoining against Defendants from enforcing them.

## COUNT THREE

### Fourteenth Amendment to the U.S. Constitution
### Equal Protection Intentional Discrimination Violation 42 U.S.C. § 1983

238.   Plaintiffs, on behalf of their Black members only, repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

239.   The Equal Protection Clause of the Fourteenth Amendment prohibits denying "any person . . . the equal protection of the laws." U.S. Const. amend. XIV, § 1. This direction requires all persons similarly situated to be treated alike.

240.   A violation of Equal Protection need not rest solely on discriminatory purposes or even have a discriminatory purpose that is dominant or primary. However, if a discriminatory purpose is a motivating factor in the decision, judicial deference is no longer justified. Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.

241.   The U.S. Supreme Court recognizes several non-exhaustive factors to inform an analysis on discriminatory intent, including: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the challenged decision; (4) departures from the normal procedural sequences; (5) substantive departures, particularly if the factors usually considered

important by the decisionmaker strongly favor a decision contrary to the one reached; and (6) legislative or administrative history including contemporary statements by members of the decision making body, minutes of its meetings, or reports.

242.    All of these non-exhaustive factors pertaining to the Creighton Memoranda and their implementation establish, separately and collectively, a discriminatory intent against Black people.

243.    The Creighton Memoranda were issued by Chancellor Creighton, at least in part, with a racially discriminatory motive and purpose. The Creighton Memoranda chill and suppress speech concerning racism and target classroom instruction that seeks to highlight Black communities and their experiences.

244.    The legislative history of certain legislation that precede but are nearly identical to the Creighton Memoranda, as well as the contemporaneous statements and actions of Chancellor Creighton, raise a strong inference of a discriminatory purpose.

245.    The known and reasonably foreseeable discriminatory impact of the Creighton Memoranda on Plaintiffs' Black members among other factors, raise a strong inference of a discriminatory purpose.

246.    Indeed, the starkly disproportionate harm on Black people, as compared to white people, from the prohibitions in the Creighton Memoranda and Defendants' enforcement of the Creighton Memoranda are alone sufficient to establish a violation of Equal Protection.

247.    Defendants lack even a rational justification for the Creighton Memoranda let alone the compelling one required, nor are the restrictions adequately tailored.

248.    Defendants' violations cause ongoing harm to Plaintiffs' Black members, should be declared unlawful, and enjoined.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs respectfully request that the Court:

A. Declare the Creighton Memoranda unconstitutional for impeding Plaintiffs' members' right to speak in violation of the First Amendment to the United States Constitution;

B. Declare the Creighton Memoranda unconstitutional and void for vagueness in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

C. Declare the Creighton Memoranda unconstitutional for being intentionally discriminatory in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution;

D. Issue preliminary and permanent injunctive relief restraining Defendants from enforcing the Creighton Memoranda and any other policy or practice with similar restrictions or prohibitions;

E. Award Plaintiffs' members costs of suit and reasonable attorneys' fees and other expenses under 42 U.S.C. § 1988; and

F. Grant such additional relief as the interests of justice may require.

DATED this 8th day of July 2026.            Respectfully submitted,

*/s/ Antonio L. Ingram II*

_____

Antonio L. Ingram II
Avatara A. Smith-Carrington*
Maydrian Strozier-Lowe *
Alyssa Gordon *

NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, D.C. 20005
aingram@naacpldf.org
acarrington@naacpldf.org
mstrozier-lowe@naacpldf.org
agordon@naacpldf.org
(202) 682-1300
FAX: (202) 682-1312

Christina Das *
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, N.Y. 10006
cdas@naacpldf.org
(212) 965-2200
FAX: (212) 226-7592

Nicholas Hite *
Elizabeth Dankers *
Kenneth D. Upton, Jr. (SBN 00797972)
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
nhite@lambdalegal.org
ldankers@lambdalegal.org
kupton@lambalegal.org
Phone: (214) 219-8585
FAX: (855) 535-2236

Katherine M. Bolger*
Rachel A. Strom*
Leena Charlton*
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Fl.
New York, New York 10020
katebolger@dwt.com
rachelstrom@dwt.com
leenacharlton@dwt.com
Tel.:  (212) 489-8230
Fax:  (212) 489-8340

*Pro hac vice application forthcoming

- 84 -