**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
EL PASO DIVISION**

|  |  |
|---|---|
| TEXAS AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS-AMERICAN FEDERATION OF TEACHERS and the AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS, <br><br> *Plaintiffs*, <br><br> v. <br><br> BRANDON CREIGHTON in his official capacity as Chancellor of the Texas Tech University System, ARCILIA ACOSTA, CODY CAMPBELL, CLAY CASH, TIM CULP, SHELLEY SWEATT, DOUG MCREAKEN, DON SINCLAIR, DUSTIN WOMBLE, and RACHEL MCLELLAND, in their official capacities as members of the Texas Tech University System Board of Regents, <br><br> *Defendants*. | Case No.  3:26-cv-01845-LS |

**PLAINTIFFS' OPPOSED MOTION FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

FACTUAL BASES RELIED UPON.................................................................................................1

POINTS AND AUTHORITY.......................................................................................................5

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ...5

    A.    The Creighton Memoranda Impose Viewpoint-Based Restrictions in Higher
        Education in Violation of the First Amendment Rights of Plaintiffs' Members.....5

    B.    The Creighton Memoranda Are Impermissibly Vague in Violation of the
        Fourteenth Amendment's Due Process Clause.......................................................14

II.   ABSENT RELIEF, PLAINTIFFS' MEMBERS WILL CONTINUE TO SUFFER
    IRREPARABLE INJURY. .......................................................................................................19

III.  THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR
    GRANTING A PRELIMINARY INJUNCTION................................................................20

CONCLUSION.......................................................................................................................20

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adams v. Trs. of Univ. of N.C.-Wilmington*,
640 F.3d 550 (4th Cir. 2011) ...................................................................................7, 10, 12

*Ashton v. Kentucky*,
384 U.S. 195 (1966)......................................................................................................14

*Baggett v. Bullitt*,
377 U.S. 360 (1964).....................................................................................................6, 14

*Bazaar v. Fortune*,
476 F.2d 570 (5th Cir. 1973), *modified on reh'g*,
489 F.2d 225 (5th Cir. 1973) ........................................................................................7

*Bishop v. Aronov*,
926 F.2d 1066 (11th Cir. 1991) .....................................................................................7

*Book People, Inc. v. Wong*,
91 F.4th 318 (5th Cir. 2024) ........................................................................................20

*Buchanan v. Alexander*,
919 F.3d 847 (5th Cir. 2019) ...................................................................................7, 9, 12

*Campbell v. St. Tammany's Sch. Bd.*,
206 F.3d 482 (5th Cir. 2000), *cert. granted, judgment vacated*,
533 U.S. 913 (2001), *and abrogated by*
*Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) ....................................................16

*Commc'ns Workers of Am. v. Ector Cnty. Hosp. Dist.*,
467 F.3d 427 (5th Cir. 2006) ...................................................................................7, 8, 9, 12

*First Nat'l Bank of Bos. v. Bellotti*,
435 U.S. 765 (1978)....................................................................................................5, 8, 16

*Freedom Path, Inc. v. IRS*,
913 F.3d 503 (5th Cir. 2019) ........................................................................................16

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)......................................................................................................9

*Heim v. Daniel*,
81 F.4th 212 (2d Cir. 2023) ...................................................................................7, 10, 12

*Hillis v. Stephen F. Aus. State Univ.*,
   665 F.2d 547 (5th Cir. Unit A 1982) .......................................................................6

*Honeyfund.com, Inc. v. DeSantis*,
   622 F. Supp. 3d 1159 (N.D. Fla. 2022), *aff'd sub nom.*
   *Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024).........................16

*Iancu v. Brunetti*,
   588 U.S. 388 (2019)...............................................................................................5, 9

*In re Dinnan v. Bd. of Regents of Univ. Sys. of Ga.*,
   661 F.2d 426 (5th Cir. Unit B Nov. 1981)................................................................6

*Johnson v. United States*,
   576 U.S. 591 (2015)....................................................................................14, 16, 18

*Kaepa, Inc. v. Achilles Corp.*,
   76 F.3d 624 (5th Cir. 1996) ......................................................................................1

*Keyishian v. Bd. of Regents of Univ. of State of N.Y.*,
   385 U.S. 589 (1967)........................................................................................6, 8, 15

*Kilborn v. Amiridis*,
   131 F.4th 550 (7th Cir. 2025), *reh'g denied*, 135 F.4th 1100 (2025) .......................7

*Local 8027 v. Edelblut*,
   No. 21-cv-1077-PB, 2024 WL 2722254 (D.N.H. May 28, 2024),
   *appeal filed*, No. 24-1690 (1st. Cir. July 26, 2024) ................................................16

*Lowery v. Mills*,
   157 F.4th 729 (5th Cir. 2025) .............................................................................7, 12

*Matal v. Tam*,
   582 U.S. 218 (2017).................................................................................................6

*Meriwether v. Hartop*,
   992 F.3d 492 (6th Cir. 2021) ........................................................................7, 10, 12

*Moody v. NetChoice, LLC*,
   603 U.S. 707 (2024)..................................................................................................8

*Muniz v. City of San Antonio*,
   476 F. Supp. 3d 545 (W.D. Tex. 2020)...................................................................15

*NAACP v. Button*,
   371 U.S. 415 (1963)................................................................................................15

*Nken v. Holder*,
  556 U.S. 418 (2009)..............................................................................................20

*Opulent Life Church v. City of Holly Springs*,
  697 F.3d 279 (5th Cir. 2012) .........................................................................19, 20

*Pernell v. Fla. Bd. of Governors of State Univ.*,
  No. 22-13992, 2026 WL 1955783 (11th Cir. July 7, 2026)...........................7, 13, 14

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*,
  391 U.S. 563 (1968)......................................................................................... *passim*

*Pleasant Grove City v. Summum*,
  555 U.S. 460 (2009)..................................................................................................9

*Reges v. Cauce*,
  162 F.4th 979 (9th Cir. 2025), *amended and superseded on denial of reh'g*,
  175 F.4th 1014 (9th Cir. 2026) ....................................................................7, 12, 13

*Reno v. ACLU*,
  521 U.S. 844 (1997)................................................................................................14

*Roman Cath. Diocese of Brooklyn v. Cuomo*,
  592 U.S. 14 (2020)..................................................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)...............................................................................................5, 6

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) ..................................................................16

*Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*,
  620 F.2d 516 (5th Cir. 1980) .................................................................................15

*Speaks v. Kruse*,
  445 F.3d 396 (5th Cir. 2006) ...................................................................................5

*Sweezy v. New Hampshire*,
  354 U.S. 234 (1957)...............................................................................................6, 8

*Tenn. Educ. Ass'n v. Reynolds*,
  732 F. Supp. 3d 783 (M.D. Tenn. 2024)................................................................16

*Terminiello v. City of Chicago*,
  337 U.S. 1 (1949)....................................................................................................15

*Walker v. Savers*,
  658 F. App'x 720 (5th Cir. 2016) ..........................................................................15

*Wieman v. Updegraff,*
    344 U.S. 183 (1952)................................................................................................6, 9

**Other Authorities**

85 Fed. Reg. 60685 (Sep. 22, 2020) ........................................................................8

Exec. Order No. 13985 (2021)..................................................................................8

Local Rule CV-7(g) ..................................................................................................1

Fed. R. Civ. P. 65..................................................................................................1, 5

Plaintiffs the Texas American Association of University Professors-American Federation of Teachers ("Texas AAUP-AFT") and American Association of University Professors ("AAUP"), on behalf of their members in the Texas Tech System, move for a preliminary injunction[1] pausing enforcement of the Creighton Memoranda pursuant to Rule 65 of the Federal Rules of Civil Procedure against the above-captioned Defendants.

**Motion Conference Requirement.** In accordance with Local Rule CV-7(g), the undersigned certifies that counsel have conferred in a good-faith attempt to resolve the matter by agreement, but Defendants declined to suspend their policies during the pendency of the litigation.

## FACTUAL BASIS RELIED UPON

Defendant Brandon Creighton took office as Chancellor of the Texas Tech University System on November 19, 2025. The board of regents raised no opposition to his curricular censorship system. Declaration of Member A ("Member A Decl.") Exs. A, B. Defendants issued the Creighton Memoranda in December 2025 ("Creighton Memorandum I") and April 2026 ("Creighton Memorandum II") to the Presidents of Texas Tech University, Texas Tech University Health Sciences Center, Angelo State University, Texas Tech University, Texas Tech University Health Sciences Center El Paso, and Midwestern State University. *Id.* Plaintiffs AAUP and Texas AAUP-AFT have members at all of these institutions. Declaration of Todd Wolfson ("Wolfson Decl.") ¶ 9.

**Creighton Memorandum I** prohibits faculty from "includ[ing] or advocat[ing] in any form course content that conflicts" with certain "standards." The restriction on

---

[1] "[T]he amount of security required pursuant to Rule 65(c) is a matter for the discretion of the trial court," and the court "may elect to require no security at all." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citation modified). Because this case concerns constitutional freedoms and Defendants will not suffer monetary harm from the Court's preliminary injunction, Plaintiffs' members respectfully request that the Court require no bond.

"Advocacy/Promotion of Race or Sex-based Prejudice" prohibits "promot[ing] or otherwise inculcat[ing] the belief" that:

> (1) One race or sex is inherently superior to another;
> (2) An individual, by virtue of race or sex, is inherently racist, sexist, or oppressive, consciously or unconsciously;
> (3) Any person should be discriminated against or receive adverse treatment because of race or sex;
> (4) Moral character or worth is determined by race or sex;
> (5) Individuals bear responsibility or guilt for actions of others of the same race or sex; or
> (6) Meritocracy or a strong work ethic are racist, sexist, or constructs of oppression.

Member A Decl. Ex. A at 1. On its face, it allows professors to promote and inculcate the inverse of these viewpoints. Creighton Memorandum I defines advocacy or promotion as "presenting these beliefs as correct or required and pressuring students to affirm them, rather than analyzing or critiquing them as one viewpoint among others. This also includes course content that promotes activism on issues related to race or sex, rather than academic instruction." *Id.* at 1. But, because the policy flat out prohibits even "including" these perspectives in curricula, a ban on professor's alleged "advocacy" or "promotion" is essentially obsolete as an evaluative metric.

The second section of Creighton Memorandum I allows only "Two Sexes Recognized Under the Law and in Course Content" and provides that:

> State law and federal policy dictate only two sexes, male and female, are recognized. Faculty are expected to comply with these standards when instructing students in their professional capacity, which includes submitting course content related to gender identity through the course content review process overseen by the Board of Regents.

*Id.* at 1. The third section of Creighton Memorandum I, "Review of Sexual Orientation Content Required," requires faculty "to submit course content related to sexual orientation through the Course Content Review Process overseen by the board of regents." *Id.* at 2.

- 2 -

The final section of Creighton Memorandum I, entitled, "Course Content Review Process," requires a faculty member who "believes a particular material or topic described above is implicated in their instruction or course materials" to "follow the Course Content Review Process . . . and the attached Course Content Review Process flowchart." *Id.* at 2.

**Creighton Memorandum II** established additional, inflexible criteria for the review process at the discretion of the board of regents. These policies were "developed by TTU System leadership in coordination with the [Academic, Clinical, and Student Affairs] Committee leadership following the review of submitted information" and sets forth a "system-wide standard" for all "course content and academic offering" across Texas Tech. It provides guidelines for the closure of academic programs that are "centered on" sexual orientation or gender identity[2] (referred to as "SOGI"), particularly where these concepts serve as the "primary subject, main theoretical framework, central narrative, or driving pedagogical purpose" within instructional materials. Regardless of having qualified professors and student interest, the Texas Tech system will stop offering courses to new students and cease to offer academic credentials in these fields entirely after current students complete their degree programs. Member A Decl. Ex. B at 2.

Creighton Memorandum II outlines additional guidance, including:

> (1) System-Wide Program Phase Out, requiring a "formal program review, followed by an admissions freeze, to initiate the closure of all academic credentials centered on SOGI."[3] *Id.* at 2;

---

[2] Program compliance requires that classroom instruction is bound to the "legal recognition of only two human sexes and strictly prohibits the endorsement of a gender spectrum or fluid gender identities as empirical biological science." Faculty "may not teach that gender identity is a fluid spectrum, endorse the existence of more than two genders, or decouple gender from biological sex as a factual or scientific baseline." Memorandum II cites "state and federal law" as a justification for this provision, without specific attribution to any particular authority. Member A Decl. Ex. B at 3.

[3] Memorandum II describes "readings, assignments, or lectures as 'centered on' SOGI when sexual orientation or gender identity serves as the primary subject, main theoretical framework, central narrative, or driving pedagogical purpose." *Id.* at 2.

(2) Core[4] Prohibitions and Advanced Course Exceptions, requiring a "strict prohibition on SOGI content in all core and lower-level undergraduate courses, requiring alternate materials if primary texts center on or include these topics."[5] *Id.* at 2;

(3) Temporary Teach-Out Exemptions, permitting "strictly temporary instructional frameworks for certain graduate coursework only for currently enrolled students completing formally identified teach-out programs at the graduate level." *Id.* at 2;

(4) Prohibition of Prejudiced Advocacy, "ban[ning] instruction that advocates for concepts of inherent racial or sexual superiority, inherent bias, or collective guilt." *Id.* at 2; and

(5) General Exemptions. *Id.* at 2.

Creighton Memorandum II further provides that "while instructors may include scholarly theories that examine the prohibited advocacy concepts below, they may not pressure students to adopt or endorse them. Any instruction involving these frameworks must be framed rigorously and objectively as theoretical concepts rather than empirical facts. Furthermore, if theories that advocate these concepts are included in a course, they must be presented alongside alternative scholarly perspectives." *Id.* at 4. It then reminds faculty that they cannot teach the six banned concepts in Creighton Memorandum I as "absolute truth." *Id.* at 4.

Defendants have not identified any professors who are "inculcating" students to believe any of the "prohibited advocacy concepts." Rather, the Creighton Memoranda have been used to

---

[4] In the Texas Tech System, designating a class as part of the core means that students can enroll in the class to satisfy any of the following general education requirements for a degree program: Communication; Language, Philosophy, and Culture; Life and Physical Sciences; Mathematics; Social and Behavioral Sciences; American History; Government/Political Science; and Creative Arts. Thus, all departments are highly motivated to have courses in the core curriculum to drive departmental enrollment numbers and signal that the specific discipline taught in that class is sufficiently important for all students at Texas Tech to learn. To have a course in the core indicates its value and importance. Member A Decl. ¶¶ 13, 14.

[5] Unlike the prohibition on SOGI materials in the undergraduate core curriculum, upper-level undergraduate and graduate courses have SOGI restrictions but feature clear exemptions for strictly defined academic purposes.

unilaterally strip concepts and historical facts from courses and ban books based on an arbitrary and inconsistent review by the board of regents, which used an artificial intelligence algorithm. Member A Decl. Ex. A, at 3.

## POINTS AND AUTHORITY

A preliminary injunction is warranted if Plaintiffs show: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Speaks v. Kruse*, 445 F.3d 396, 399–400 (5th Cir. 2006); *see* Fed. R. Civ. P. 65. As set forth below, Plaintiffs satisfy all four prongs of this standard.

I. **PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

A. **The Creighton Memoranda Impose Viewpoint-Based Restrictions in Higher Education in Violation of the First Amendment Rights of Plaintiffs' Members.**

It is a cardinal principle of the First Amendment that "the government may not regulate speech based on . . . the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). These viewpoint restrictions "discriminate against speech based on the ideas or opinions it conveys," *Iancu v. Brunetti*, 588 U.S. 388, 393 (2019), and are considered "an egregious form of content discrimination," *Rosenberger*, 515 U.S. at 829, and a "poison." *Iancu*, 588 U.S. at 399 (Alito, J., concurring). When the government targets particular views expressed by a speaker, the First Amendment violation "is all the more blatant." *Rosenberger*, 515 U.S. at 829 (citing *R.A.V. v. St. Paul*, 505 U. S. 377, 391 (1992)). It is unquestionably antithetical to a free society for the government to give "one side of a debatable public question an advantage in expressing its views to the people." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 785 (1978).

For these reasons, regulations that engage in viewpoint discrimination are "presumed to be unconstitutional." *Rosenberger*, 515 U.S. at 828.

The Supreme Court interprets "the term 'viewpoint' discrimination in a broad sense." *Matal v. Tam*, 582 U.S. 218, 243 (2017) (quoting *Rosenberger*, 515 U.S. at 831). Like prohibiting any discussion of religion in schools, the Creighton Memoranda's prohibition of curriculum containing certain views on race, sexual orientation, and gender identity "discriminate against an entire class of viewpoints." *Rosenberger*, 515 U.S. at 831. Indeed, proscribing all conversations about race would discriminate based on viewpoint, as much as prohibiting a range of voices on this topic. *See id.* ("If the topic of debate is, for example, racism, then exclusion of several views on that problem is just as offensive to the First Amendment as exclusion of only one.").

The Supreme Court recognizes First Amendment protections against viewpoint discrimination in the education context and "[t]ime after time ... has upheld academic freedom in the face of government pressure." *In re Dinnan v. Bd. of Regents of Univ. Sys. of Ga.*, 661 F.2d 426, 430 (5th Cir. Unit B Nov. 1981) (citing *Cramp v. Bd. of Pub. Instruction*, 368 U.S. 278 (1961)); *see, e.g.*, *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 597–99 (1967) (striking down a law which allowed for educators to be removed for "treasonable or seditious" utterances or acts, on the grounds that it unduly chilled educators' classroom expression); *Baggett v. Bullitt*, 377 U.S. 360, 371–72 (1964) (striking down an anti-sedition oath because it had the potential to chill a teacher from "voicing far-reaching criticism of any old or new policy followed by the Government of the United States"); *Sweezy v. New Hampshire*, 354 U.S. 234, 249–51 (1957); *Wieman v. Updegraff*, 344 U.S. 183, 190–92 (1952). Academic freedom's "roots have been found in the [F]irst [A]mendment insofar as it protects against infringements on a teacher's freedom concerning classroom content and method." *Hillis v. Stephen*

*F. Aus. State Univ.*, 665 F.2d 547, 553 (5th Cir. Unit A 1982).

The consequences of First Amendment violations in the university setting are particularly dangerous and undermine the "historical role of the University in . . . serving in the vanguard in the fight for freedom of expression and opinion." *Bazaar v. Fortune*, 476 F.2d 570, 580 (5th Cir. 1973), *modified on reh'g*, 489 F.2d 225 (5th Cir. 1973). According to the Fifth Circuit, "[t]he right question for courts to ask about academic freedom is how to fashion doctrine that best protects the freedom of thought, of inquiry . . . of the academic profession." *Buchanan v. Alexander*, 919 F.3d 847, 852 n.11 (5th Cir. 2019). To answer this question, the majority of federal courts of appeal have applied the balancing test established in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563, 568 (1968). *See, e.g.*, *Kilborn v. Amiridis*, 131 F.4th 550, 554 (7th Cir. 2025), *reh'g denied*, 135 F.4th 1100 (2025); *Adams v. Trs. of Univ. of N.C.-Wilmington*, 640 F.3d 550, 564 (4th Cir. 2011); *Reges v. Cauce*, 162 F.4th 979, 1000 (9th Cir. 2025), *amended and superseded on denial of reh'g*,175 F.4th 1014 (9th Cir. 2026); *Meriwether v. Hartop*, 992 F.3d 492, 508 (6th Cir. 2021); *Heim v. Daniel*, 81 F.4th 212, 226 (2d Cir. 2023); *accord Pernell v. Fla. Bd. of Governors of State Univ.*, No. 22-13992, 2026 WL 1955783, at *5 (11th Cir. July 7, 2026) (applying its own balancing test in *Bishop v. Aronov*, 926 F.2d 1066 (11th Cir. 1991)). Like the majority of circuits, the Fifth Circuit applies *Pickering* to cases involving university professors' academic speech. *See Buchanan*, 919 F.3d at 853–54; *Lowery v. Mills*, 157 F.4th 729, 735 (5th Cir. 2025).

*Pickering* requires "two inquiries to guide interpretation of the constitutional protections accorded to public employee speech." *Commc'ns Workers of Am. v. Ector Cnty. Hosp. Dist.*, 467 F.3d 427, 436 (5th Cir. 2006) (citation modified). The first requires determining whether the employee spoke as a citizen on a matter of public concern. *Id.*; *see Pickering*, 391 U.S. at 568.

Second, whether the government had an adequate justification for its interference with the employee's speech. *Commc'ns Workers of Am.*, 467 F.3d at 436; *see Pickering*, 391 U.S. at 568.

The Creighton Memoranda restrict curricular speech across the board in the Texas Tech system by discriminating on the basis of viewpoint and, thus, are facially unconstitutional.[6] In the context presented here, the Court must weigh the constitutional necessity of safeguarding academic freedom—including the freedom of teachers and students freely to inquire, to study, and to evaluate to gain new maturity and understanding—against the government's justification for interfering with and regulating classroom speech. *See Keyishian*, 385 U.S. at 603; *Sweezy*, 354 U.S. at 250. Plaintiffs' members clearly prevail.

*First*, the Creighton Memoranda are based on prior policies found to constitute viewpoint discrimination. In 2020, the federal government released an executive order that sought to ban nine "divisive concepts." *See* Combating Race and Sex Stereotyping, 85 Fed. Reg. 60685 (Sep. 22, 2020). In the following years, states copied the text of this executive order into their own laws banning the same "divisive concepts"—sometimes dropping one or two concepts. The executive order has since been rescinded (*see* Exec. Order No. 13985 (2021)), and the Eleventh Circuit recently decided that these "divisive concepts" constitute viewpoint discrimination. *See Pernell*, 2026 WL 1955783, at *4. Nevertheless, the Creighton Memoranda copy six of those divisive concepts verbatim and prohibit even "including" texts or discussions that reference or affirm these concepts, while permitting their disavowal. In addition, the Creighton Memoranda ban certain

---

[6] Most circuits that deal with conflicts between a professor's classroom speech and a public institution's restrictions address First Amendment claims in an as-applied context. Because of the Creighton Memoranda's reach and effect across the entire university system, the balancing test necessarily differs slightly. Examples of member harm shown in support of this motion demonstrate the depth and diversity of the Creighton Memoranda's scope. Because the policy's unyielding censorship has no constitutional application, it must be enjoined facially. Occasional ad hoc exceptions cannot save it. *Moody v. NetChoice, LLC*, 603 U.S. 707, 723–24 (2024).

viewpoints related to sexual orientation and gender identity. These prohibitions constitute textbook viewpoint discrimination. *See Iancu*, 588 U.S. at 394 (finding viewpoint-based restriction because law "favors" views "aligned with conventional moral standards" and "disfavors" views "hostile to them"). Banning university professors from teaching certain books, historical facts, topics, or even music, or from engaging in academic discussions of certain topics also cannot be justified by the government speech doctrine.[7]

*Second*, Plaintiffs' members at Texas Tech have First Amendment protections in the classroom under the *Pickering* balancing test. At step one of the *Pickering* test, Plaintiffs' members face viewpoint-based censorship for speaking on matters of public concern. *See Commc'ns Workers of Am.*, 467 F.3d at 436; *see also Pickering*, 391 U.S. at 568. Courts regularly treat professors' classroom instruction on issues implicated here as matters of public concern. For example, the Fifth Circuit—like other circuits—has held that speech involves a matter of public concern when "it involves an issue of social, political, or other interest to a community," which issues of race, sexual orientation, and gender identity clearly are. *Buchanan*, 919 F.3d at 853 (quoting *Adams*, 640 F.3d at 564). Indeed, the *Buchanan* court noted that classroom speech and

---

[7] The very nature of the nature of the academic exception in *Garcetti v. Ceballos* turns on the fact that classroom instruction by public university professors is *not* government speech. 547 U.S. 410, 425 (2006). However, to the extent the government claims the viewpoints expressed in the Memoranda are government speech, as a justification this fails as well. The underlying rationale for the government speech doctrine is that the government could not function if it could not favor or disfavor certain points of view in its programs. *Pleasant Grove City v. Summum*, 555 U.S. 460, 468 (2009) But a university, unlike other government programs, cannot properly function if the government *is allowed* to pick and choose which viewpoints may be expressed during classroom teaching. The consequences of allowing total government control over classroom speech, without any First Amendment protection against viewpoint discrimination, would be disastrous for higher education and democracy. *Wieman v. Updegraff*, 344 U.S. 183, 195 (1952) (Frankfurter, J., concurring) (Politically motivated silencing of *any* classroom speech by the government "has an unmistakable tendency to chill that free play of the spirit which all teachers ought especially to cultivate and practice.").

discussion of controversial viewpoints that are at least tangentially related to college-level curricula is a matter of public concern. *Buchanan*, 919 F.3d at 854.

Multiple appellate courts applying the *Pickering* balancing test to viewpoint discrimination claims have also found that perspectives on these social issues are matters of public concern. *See, e.g.*, *Adams*, 640 F.3d at 564–65 ("academic freedom, civil rights, campus culture, sex, feminism, abortion, homosexuality, religion, and morality" constituted matters of public concern). Perhaps most analogous to the subject matter banned in the Creighton Memoranda, the Sixth Circuit found that a "professor's in-class speech about 'race, gender, and power conflicts' addresses matters of public concern." *Meriwether*, 992 F.3d at 508. The Sixth Circuit explained that the "linchpin of the inquiry is . . . for both public concern and academic freedom, the extent to which the speech advances an idea transcending personal interest or opinion which impacts our social and/or political lives." *Id.* And the Second Circuit similarly stated that, when applying *Pickering* to academic speech, "discussion regarding current government policies and activities is perhaps the paradigmatic matter of public concern." *Heim*, 81 F.4th at 229. It is clear that topics of current social and political relevance are quintessential matters of public concern.

For example, Defendants have used the Creighton Memoranda to censor texts and discussions by Plaintiffs' members about certain viewpoints related to anti-Black racism, gay and bisexual men, and transgender people. Member A Decl. ¶¶ 21–23; Declaration of Member B ("Member B Decl.") ¶ 4; Declaration of Member C ("Member C Decl.") ¶¶ 6–11; Declaration of Member D ("Member D Decl.") ¶¶ 20–29. For example, Chancellor Creighton and the board of regents required Plaintiffs' Member A to remove excerpts of *Between the World and Me* by Ta-Nehisi Coates from their undergraduate English course because it purportedly violated the Creighton Memoranda's prohibition on race and sex-based prejudice. Member A Decl. ¶ 21. In his

award-winning memoir, Coates explores the Black experience in America, the history of racism in the United States, and his perspective as a Black man on the American dream. Member A Decl. ¶¶ 5, 6. After the course review process, the board of regents informed Member A that the book violated the Creighton Memoranda's race and sex-based prejudice advocacy because it "promotes the belief that meritocracy is a construct of oppression designed to exploit Black bodies" and, therefore, "directly violates the system's Prohibition of Prejudiced Advocacy." Member A Decl. ¶ 21. The Creighton Memoranda's viewpoint discrimination prohibits Member A from using *Between the World and Me*—even if the professor does not "advocate" or "promote" the viewpoints expressed in the book and resulted in the demotion of their course from the core curriculum to an elective.

Another Plaintiffs' member, Member B, teaches first- and second-year medical students about sex function and dysfunction and received guidance from the Office of Curriculum to remove content about transgender patients and intersex patience even though they experience sexual dysfunction at a higher rate than members of the general population. Member B Decl. ¶¶ 3, 4. Compliance with the Creighton Memoranda has prevented Member B from providing important and necessary medical training to their students, despite the Creighton Memoranda containing specific exemptions for "licensure, certification, and patient care." Member A Decl. Ex. B at 3.

In another situation, Plaintiffs' member, Member C, was forced to modify an upcoming course, currently listed in the core curriculum, about the Holocaust to comply with the Creighton Memoranda. Member C Decl. ¶ 18. Member C plans to teach a course in Spring 2027 about the Holocaust, the only course at Texas Tech exclusively focused on the topic, and received notification from their chair that the course violates the Creighton Memoranda because it contains content about the gay and bisexual men persecuted and murdered during the Holocaust by the Nazi

regime. Member C Decl. ¶ 18. Member C must modify the course to exclude these historically accurate facts, or it will be demoted to an elective. The course's demotion to an elective significantly reduces the incentive for students to take it, which could lead to a decline in enrollment and potential course cancellation. Due to the Creighton Memoranda, Texas Tech is closing the entire Women and Gender Studies department and their related minors and certificate programs, based on the disfavored viewpoints in those departments. Member D Decl. ¶ 31. Member D faces a loss of employment due to their teaching and research on issues of public concern—such as feminism, racism, and LGBTQ communities—as Chancellor Creighton shutters their department. Member D Decl. ¶ 31.

Plaintiffs' members are clearly engaged in speech that is a matter of public concern—a conclusion made even more clear by the fact that these Defendants view the topics Plaintiffs' members teach as controversial and debatable. *See Heim*, 81 F.4th at 229. They are topics that prompt query and are prominent in public discourse. *See Meriwether*, 992 F.3d at 509; *Adams*, 640 F.3d at 564–65. They are not, however, topics that are "clearly not related" to an "academic purpose"—to the contrary, the *entire* purpose of teaching these topics is academic. *See Buchanan*, 919 F.3d at 853–54.

At *Pickering* step two, Defendants have offered no "adequate justification" for interfering with Plaintiffs' members' speech. *Commc'ns Workers of Am.*, 467 F.3d at 436; *see Pickering*, 391 U.S. at 568; *see also Lowery*, 157 F.4th at 744.

Given the unique nature of higher education and the university setting, including academic freedom's fundamental interest in protecting the freedom of thought and inquiry of the academic profession, *Buchanan*, 919 F.3d at 852 n.11, this element of the *Pickering* test weighs in favor of Plaintiffs' members. The Ninth Circuit applied *Pickering* in favor of a professor because the First

Amendment right to speak on matters of public concern outweighed the state's interest in preventing student disagreement. *Reges*, 162 F.4th at 100–01. Although the government's concern was student unrest, which Defendants have not even offered as a justification here, the Ninth Circuit nevertheless afforded the professors' interest greater weight:

> [S]tudent disagreement with a professor's academic speech on an issue of public concern cannot alter the *Pickering* analysis in the government's favor. The reason is foundational: the First Amendment's protections for academic freedom in public universities will necessarily lead to disagreements on campus. Student unrest is an inevitable byproduct of our core First Amendment safeguards in the higher education context. This unrest therefore cannot be the type of disruption that permits restricting or punishing a professor's academic speech.

*Id.* The court further explained, "some types of government employers depend on command and control. But under the First Amendment, a public university's oversight of academic speech lacks any comparable justification." *Id.* at 1001.

The recent Eleventh Circuit decision in *Pernell* involved a balancing of similar facts and involved nearly identical speech restrictions. There, Florida's interest was "coercing university faculty (and by extension the students) into avoiding a certain set of ideas." *Pernell*, 2026 WL 1955783, at *13. The court concluded that, "[n]o matter how controversial the ideas, allowing the government to set the terms of the debate is poison, not antidote." *Id.* (citing, *inter alia*, *Sweezy*, 354 U.S. at 251). The court also rejected as "a far cry from ordinary workplace management concerns, much less a legitimate pedagogical interest" any government interest associated with promoting classroom efficiency or appropriately educating students based on Florida's judgment that the forbidden viewpoints are contrary to the State's most cherished ideals. *Id.* at *14. Finally, the court distinguished the government's purported justification—an "interest in preventing invidious racial discrimination in public education"—noting that preventing professors from positively discussing a viewpoint is not the same as regulating discrimination. *Id.* at *14–15.

- 13 -

Rather, the government had "no compelling interest in creating a per se rule that some speech, regardless of its context or the effect it has on the listener, is offensive and discriminatory." *Id.* at *15. Weighing the justifications against the "strong predilection for academic freedom," the government's restrictions exceeded any legitimate boundaries of government's control over in-class, curricular speech. *Id.* at *15, *17.

*Pickering* balancing similarly should lead to the protection of the First Amendment rights of Plaintiffs' members. They have been barred altogether from teaching coursework based on their viewpoints about race, sexual orientation, and gender identity. Books are being outright banned, and historical facts removed from coursework. These decisions are being made *not* by the academy, but by the chancellor and the board of regents—political appointees who lack pedagogical expertise about the viewpoints they restrict. Here, as in *Pernell*, the outright ban serves no ordinary academic interest. *Id.* at *6. "[T]he text of this law does not seek to develop the curriculum of a university, of a major, or even of a class. Instead, it seeks to bar disfavored speech on one set of topics at every university and in any class." *Id.* at *12.

**B.    The Creighton Memoranda Are Impermissibly Vague in Violation of the Fourteenth Amendment's Due Process Clause.**

The Creighton Memoranda are unconstitutionally vague in violation of the First and Fourteenth Amendment. A law is unconstitutionally vague if it: (1) "fails to give ordinary people fair notice of the conduct it punishes," or (2) is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). Vague laws implicating speech are particularly concerning as they force potential speakers to "steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked." *Baggett*, 377 U.S. at 373; *see Ashton v. Kentucky*, 384 U.S. 195, 200 (1966); *see also Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) (a vague regulation of speech "raises special First Amendment concerns because of its

- 14 -

obvious chilling effect on free speech"). The Creighton Memoranda's unclear language have already had the exact "chilling effect" that the Supreme Court cautioned to avoid, as Plaintiffs' members are left with no choice but to self-censor their constitutionally protected academic speech or risk punishment, up to and including termination.

Vague laws regulating speech face particular scrutiny because "[t]he threat of sanctions may deter their exercise almost as potently as the actual application of sanctions." *NAACP v. Button*, 371 U.S. 415, 432–33 (1963). First Amendment freedoms "need breathing space to survive;" thus, the "standards of permissible statutory vagueness" impacting speech "are strict." *Id.* at 432. This strict standard ensures speakers are not pressured to censor themselves, especially as "[t]he right to speak freely and to promote diversity of ideas and programs is . . . one of the chief distinctions that sets us apart from totalitarian regimes." *Terminiello v. City of Chicago*, 337 U.S. 1, 4 (1949).

In education specifically, the Court has warned that "[t]he danger of [the] chilling effect upon the exercise of vital First Amendment rights must be guarded against by sensitive tools which clearly inform teachers what is being proscribed." *Keyishian*, 385 U.S. at 604. The Fifth Circuit has embraced this strict standard, holding that the "degree of specificity required in regulations affecting First Amendment rights is even greater" than those impacting other rights. *Shamloo v. Miss. State Bd. of Trs. of Insts. of Higher Learning*, 620 F.2d 516, 523 (5th Cir. 1980).

Here, the Creighton Memoranda are purposefully and incurably vague, as evidenced by the censorship that has already occurred since its implementation. *See Walker v. Savers*, 658 F. App'x 720, 729–30 (5th Cir. 2016). When determining if a policy is unconstitutionally vague, a court examines the language used and determines whether an ordinary person would have been able to determine that the relevant conduct was prohibited. *Muniz v. City of San Antonio*, 476 F. Supp. 3d

545, 555 (W.D. Tex. 2020). The Fifth Circuit has found that even "if a rule is understandable, it also may fail vagueness analysis if it is inconsistently or arbitrarily applied." *Campbell v. St. Tammany's Sch. Bd.*, 206 F.3d 482, 484 (5th Cir. 2000), *cert. granted, judgment vacated*, 533 U.S. 913 (2001), *and abrogated by Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001) (quoting *Dallas Ass'n of Cmty. Orgs. for Reform Now v. Dallas Cnty. Hosp. Dist.*, 670 F.2d 629, 633 (5th Cir. Unit A 1982)).

*First*, the Creighton Memoranda are vague because they "fail[] to give ordinary people fair notice of the conduct [they] punish[]." *Johnson*, 576 U.S. at 595. The Court needs only to look to the text of the policy in question. *See Freedom Path, Inc. v. IRS*, 913 F.3d 503, 508 (5th Cir. 2019) (citation modified). Here, the Creighton Memoranda's text are facially vague. Multiple courts have found terms like "advocating" and "inculcating," and the concepts listed as the "race or sex-based prejudice" in the Creighton Memoranda to be unconstitutionally vague.[8] Yet Creighton Memorandum I prohibits faculty from "promot[ing] or otherwise inculcat[ing]" certain views on race or gender. *See* Member A Decl. Ex. A. And the Creighton Memoranda provide no clarity on what "inculcating" and "promoting" look like in practice when books are being banned wholesale

---

[8] *Local 8027 v. Edelblut*, No. 21-cv-1077-PB, 2024 WL 2722254, at *2, *17 (D.N.H. May 28, 2024), (finding phrases "an individual, by virtue of race or sex, is inherently racist, sexist, or oppressive, consciously or unconsciously," "an individual should be discriminated against or receive adverse treatment because of his or her age, sex, gender identity, sexual orientation, race, creed [or] color" as unconstitutionally vague), *appeal filed*, No. 24-1690 (1st. Cir. July 26, 2024); *Honeyfund.com, Inc. v. DeSantis*, 622 F. Supp. 3d 1159, 1169, 1181–82 (N.D. Fla. 2022), (finding the phrase "that the moral character or status as either privileged or oppressed is necessarily determined by his or her race, color, religion, sex, or national origin" unconstitutionally vague), *aff'd sub nom. Honeyfund.com Inc. v. Governor*, 94 F.4th 1272 (11th Cir. 2024); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020) (finding phrase "an individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive, whether consciously or unconsciously" as unconstitutionally vague); *Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 808 (M.D. Tenn. 2024) (denying motion to dismiss where plaintiffs asserted plausible theory that concepts making use of values-laden terms, such as the phrase "meritocracy is inherently racist or sexist," was unconstitutionally vague).

- 16 -

whether or not the professor will "advocate" the ideas expressed in those books. Further, Creighton Memorandum II permits the teaching of these divisive concepts as long as they "do not pressure students to adopt or endorse them" or teach them as "absolute truth." *See* Member A Decl. Ex. B. Even when discussing controversial topics, professors do not require their students to adopt arguments wholesale. Indeed, over the course of a semester, professors often present doctrines or concepts that conflict with one another. The so-called controversial books or texts are used to teach critical thinking, argumentation, or even simply to understand another perspective, whether or not the students ultimately adopt it as their own. Defendants have not provided—and Plaintiffs have not uncovered—any instance where a professor "inculcated" their students or forced them to accept any topic as "absolute truth."

Furthermore, determinations of what is allowed and what is prohibited have been unclear, and largely unjustified, by the Creighton Memoranda themselves. These vague definitions have already led to confusion on which texts are actually prohibited. For example, Member A is unclear why the board of regents determined that *Between the World and Me* "promot[es] the belief that meritocracy is a construct of oppression designed to exploit Black bodies," which was the justification given for its alleged violation of the Creighton Memoranda. Member A Decl. ¶ 21. Even if "meritocracy as a construct of oppression" were the central thesis of the book, there is no evidence or indication that Member A violated any of these rules by merely including *Between the World in Me* in their course reading list. Students were never required to adopt or accept the author's opinions.

Similarly, Member B experienced confusion because the Creighton Memoranda's prohibition against SOGI does not mention medical training to students in the presence of transgender patients, in fact, it provides explicit exceptions for materials required for "licensure,

certification, or patient care" and "intersex biological conditions are expressly permitted." Yet, Member B received guidance to not provide such training. The vagueness is further demonstrated by subsequent, contradicting guidance permitting that care. Member B Decl. ¶ 6.

*Second*, the Creighton Memoranda are unconstitutionally vague because they are "so standardless that [they] invite[] arbitrary enforcement." *Johnson*, 576 U.S. at 595. This is evidenced on multiple levels. For example, the Creighton Memoranda differentiate between undergraduate coursework and graduate coursework. Member A Decl. ¶ 26; Member B Decl. ¶¶ 3, 6; Member C Decl. ¶ 14; Member D Decl. ¶ 21. Chancellor Creighton and the board of regents determined that certain coursework violated the Creighton Memoranda because of perspectives related to sexual orientation and gender identity. Member B Decl. ¶ 4; Member C Decl. ¶¶ 12–18. However, Member D teaches a graduate study course that includes discussions about sexual orientation and gender identity, which is allowed to continue unmodified until the Women and Gender Studies Department closes. Member D Decl. ¶¶ 23–29. Conversely, Member C planned to teach undergraduate students about gay and bisexual victims of the Holocaust—an undeniable historical fact—and was prohibited from including that material if Plaintiffs' member wanted the course to maintain its core designation. Member C Decl. ¶ 18. This difference cannot be explained by differences in age-related sensitivities between undergraduate and graduate students, as they are both adults who voluntarily attend the university. It is arbitrary to let graduate students learn about certain views on sexual orientation and gender identity while prohibiting undergraduate students from learning the same.

In addition, the board of regents' decisions on French language and French literature courses illustrate this arbitrary enforcement and lack of standards. Member C received notification to remove content about sexual orientation from their literature course because the materials

explicitly "focus on sexual orientation, gender identity beyond binary structures, and sex-based ecofeminism within contemporary French fiction and film." Member C Decl. ¶ 14. However, the board of regents only mandated Member C to remove five songs that focused on gay, lesbian, or queer relationships/identities while leaving songs about heterosexual relationships in the course. Member C Decl. ¶ 12. Plaintiffs' member experienced confusion because the Creighton Memoranda do not define sexual orientation as only content related to LGBTQ sexual orientation and, therefore, these materials should have been flagged as well. Member C Decl. ¶ 13; *see* Member A Decl. Ex. B at 2 (course content is "'centered on' SOGI when sexual orientation or gender identity serves as the primary subject"). Moreover, the board of regents did not prohibit other coursework in their French Literature course, which explicitly discusses LGBTQ sexual orientation and gender identity. Member C Decl. ¶ 15.

The Creighton Memoranda are standardless and fail to give Plaintiffs' members notice of what is prohibited. The Court should find them impermissibly vague.

## II.   ABSENT RELIEF, PLAINTIFFS' MEMBERS WILL CONTINUE TO SUFFER IRREPARABLE INJURY.

Without injunctive relief, Plaintiffs' members unquestionably will suffer irreparable harm. That the Creighton Memoranda violate Plaintiffs' members' constitutional rights under the First and Fourteenth Amendments constitutes irreparable injuries in and of itself. *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) ("[L]oss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.") (citation modified); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Here, as explained above, the Creighton Memoranda clearly violate the constitutional rights of Plaintiffs' members under the First and Fourteenth

- 19 -

Amendments. The Memoranda prohibit professors from "advocating," teaching, discussing, or *even referencing* certain viewpoints on topics that the chancellor and board of regents deem unsavory. Notably, it is nearly impossible to determine exactly which topics and texts are prohibited, based on the criteria in the Creighton Memoranda. Instead, the Creighton Memoranda create a vague, far-reaching web of uncertainty that has censored their academic speech and will continue to do so.

III.    **THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST FAVOR GRANTING A PRELIMINARY INJUNCTION.**

The balance of the equities and the public interest "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), and favor enjoining the Creighton Memoranda because the First and Fourteenth Amendment rights of Plaintiffs' members will continue to be infringed otherwise. *See Opulent Life Church*, 697 F.3d at 298 ("Injunctions protecting First Amendment freedoms are always in the public interest.") (citation modified). The Creighton Memoranda have forced many professors to alter their curricula, and some courses have been cancelled altogether. This is more than a chilling effect; it is outright censorship that will continue to violate the professors' First Amendment rights as long as the Creighton Memoranda remain in effect.

On the other side, neither Defendants nor the public have a legitimate interest in the enforcement of unconstitutional policies. *See Book People, Inc. v. Wong*, 91 F.4th 318, 341 (5th Cir. 2024) (finding that "neither [the State] nor the public has any interest in enforcing a regulation that violates federal law.").

**CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request that the Court preliminarily enjoin Defendants from enforcing the Creighton Memoranda.

DATED this 17th day of July 2026.

Respectfully submitted,

*/s/ Antonio L. Ingram II*

Antonio L. Ingram II
Avatara A. Smith-Carrington (*admitted pro hac vice*)
Maydrian Strozier-Lowe (*admitted pro hac vice*)
Alyssa Gordon (*admitted pro hac vice*)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
700 14th Street NW, Suite 600
Washington, D.C. 20005
aingram@naacpldf.org
acarrington@naacpldf.org
mstrozier-lowe@naacpldf.org
agordon@naacpldf.org
(202) 682-1300
FAX: (202) 682-1312

Christina Das (*admitted pro hac vice*)
NAACP LEGAL DEFENSE &
EDUCATIONAL FUND, INC.
40 Rector Street, 5th Floor
New York, N.Y. 10006
cdas@naacpldf.org
(212) 965-2200
FAX: (212) 226-7592

Nicholas Hite (*admitted pro hac vice*)
Elizabeth Dankers (*admitted pro hac vice*)
Kenneth D. Upton, Jr. (SBN 00797972)
LAMBDA LEGAL DEFENSE AND
EDUCATION FUND, INC.
3500 Oak Lawn Avenue, Suite 500
Dallas, TX 75219
nhite@lambdalegal.org
ldankers@lambdalegal.org
kupton@lambdalegal.org
Phone: (214) 219-8585
FAX: (855) 535-2236

Katherine M. Bolger (*admitted pro hac vice*)
Rachel A. Strom (*admitted pro hac vice*)
Leena Charlton (*admitted pro hac vice*)
DAVIS WRIGHT TREMAINE LLP
1251 Avenue of the Americas, 42nd Fl.
New York, New York 10020
katebolger@dwt.com
rachelstrom@dwt.com
leenacharlton@dwt.com
Tel.: (212) 489-8230
Fax: (212) 489-8340

- 21 -